## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division



**D.T and M.T, as parents and next friend of S.T.,Plaintiffs,**


**v.**


Civil Action No. 1:20CV460 CMH/IDD

**Fairfax County School Board, Defendants.**


### Statement

1.Plaintiffs M.T. and D.T., as Parents, of Student ("Student"), a minor child (collectively, "Plaintiffs"), filed this appeal to:

(a) Seek reversal of denied relief of an Administrative Due Process decision rendered by the Commonwealth of Virginia Hearing Officer finding that Defendant Fairfax County Public Schools ("FCPS")("LEA") offered Student a free appropriate public education ("FAPE")

(b) Allege FCPS deprived Plaintiffs of their rights under the Individual with Disabilities Education Improvement Act ("IDEA") and seek relief.

(c) Allege FCPS deprived Plaintiffs of their rights under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and seek relief.

(c) Allege FCPS deprived Plaintiffs of their rights under Title II of the American with Disabilities Act of 1990 and seek relief.

(d) Allege FCPS deprived Plaintiffs of their rights under the Equal Protection Clause of the United States Constitution and seek relief.

(e) Allege FCPS deprived Plaintiffs of their rights under 42 U.S.C 1983 and seek relief.

(f) Allege FCPS deprived Plaintiffs of their rights under the First Amendment and seek relief.

(g) Allege FCPS deprived Plaintiffs of their rights under Every Student Succeeds Act and seek relief.

## Complaint

The Parents of S.T., D.T and M.T, bring this action pursuant to federal and state implementing regulations. The Parents seek reversal of the Hearing Officer's January 21, 2020 decision, to the extent that the decision was adverse to the Parents and Student, and seeks a ruling in favor of the Plaintiffs.

## Regulations

- **IDEA 2004**
- **Section 504 34 C.F.R Part 104**
- **ADA Title II**
- **Every Student Succeeds Act**
- **Elementary and Secondary Education Act of 1965**
- **Equal Protection Clause 42 U.S.C 1983**
- **Office of Civil Rights and Virginia Department of Education**

  - https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201607-504-adhd.pdf
  - https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20071226.html
  - https://sites.ed.gov/idea/files/idea/policy/speced/guid/idea/memosdcltrs/guidance-on-dyslexia-10-2015.pdf
  - http://www.doe.virginia.gov/special_ed/iep_instruct_svcs/stds-based_iep/stds_based_iep_guidance.pdf
  - https://sites.ed.gov/idea/files/idea/policy/speced/guid/idea/memosdcltrs/guidance-on-fape-11-17-2015.pdf

## List of Attachments

- United States Department of Education, Office of Civil Rights, Dear Colleague Letter, July 26, 2016
- United State Department of Education, Office of Special Education and Rehabilitation Services, Dear Colleague Letter, October 23, 2015
- United State Department of Education, Office of Civil Rights, Dear Colleague Letter, DEC 26, 2007
- US Department of Justice/US Department of Education, Dear Colleague Letter, November 12, 2014
- United State Department of Education, Office of Special Education and Rehabilitation Services, Dear Colleague Letter, November 16, 2015

A. Due Process Hearing Case No. 20-030 Decision, JAN 21, 2020
B. Document Meta-Data - Due Process Hearing Transcript LEA Delivery
C. LEA Counsel Billing Invoice #167914
D. LEA Counsel Billing Invoice #168695
E. LEA Counsel Billing Invoice #168695
F. Diplomas and Completion
G. Due Process Hearing Case No. 20-030, Decision of Hearing Officer on Sufficiency of Complaint
H. LEA "Hot Topics" report
I. District-wide Student Assessment and Data (Provided to Parents on 1/30/2020)
J. LEA schools Course Selection Sheets
K. Defining a Standards-Based IEP
L. LEA Office of Due Process and Eligibility Public Comments
M. Sample IEP from an LEA Student
N. The Decoder:Program Highlight, When It's Not Dyslexia:Using Just Words
O. FCPS Guidelines for Independent Educational Evaluations
P. FCPS Middle School Academic and Career Plan
Q. Parent's Counsel Letter to LEA Coordinator, Due Process and Eligibility, August 12, 2019
R. FCPS Clues to Dyslexia
S. FCPS Extended School Year (ESY) Services

**<u>Background and Statements of Fact</u>**

Student is currently in the ninth grade and enrolled in Fairfax County Public Schools ("FCPS"). The Student has sustained lost educational opportunities. FCPS has discriminated against the Student based on disability by withholding access and availability of accommodations, supports and services deemed appropriate and necessary for a FAPE as identified by the Student's unique needs. Furthermore, FCPS has restricted and not provided a standards based Individualized Education Program ("IEP"), calculated to provide "comparable benefits and services" afforded in the same quality education as the Student's nondisabled peers. Inaccurate reporting, invaild evaluation data, and false reporting of Student performance impeded the Parents ability to provide informed consent. FCPS continues to retaliate and exhibit a culture of, "you do not need to know" toward the Parents by engaging in the concealment, delay, and destruction of the Student's education records. As a result, FCPS has deprived the Student of equal access and educational opportunities, resulting in a denial of a Free and Appropriate Public Education ("FAPE").

**I. Hearing Officer Decision (Attachment A)**

- **8VAC20-81-210 Due Process Hearing**
- **Title II ADA, 504, Sec. 1983, ESSA, Equal Protection Clause**
- **§1415(f)(1)(A) Impartial Due Process Hearing:**

    *"(A) Whenever a complaint has been received under subsection (b)(6) or (k), the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency."*

    1. At the prehearing conference on 12/2/19, the LEA counsel requested 12/18/19 for the proceedings to take place. The date of 12/19/19 was set aside for a possible second day. The Hearing Officer agreed to the LEA's request for a change in date but did not agree to the Parent's request for a change in date to meet a religious obligation. Instead, he informed the Parents they did not need to attend the proceeding (TR PreHearing Conference).

    2. The Hearing Officer was not impartial as evidenced in his racially-biased actions during the hearing and comments within his written decision, to include his curious focus on the race of Parent's advocate.

a. During the hearing, the Hearing Officer did not consider the racial ominous of the LEA ordering, without reason, a security guard to be stationed outside the Student's IEP meeting due to the advocate's attendance. The LEA Principal later testified she was aware that ordering law enforcement, without reason, on a person of color can be considered a hate crime. (TR2:p356:8-11)

    i. In regard to the LEA needlessly posting a security guard outside of the IEP meeting held in August 2019, rather than considering the incident, the Hearing Officer instead focused on the race of the advocate in his Decision. He specifically stated, "The Parent's advocate identified herself as a 'black woman' in documentation of the incident and physically appears to be a person of mixed race." (Attachment A, pg. 2)

3. The Hearing Officer did not compel the School Board to produce the Student's complete education record as in the subpoena request. The Plaintiff's advocate and the Plaintiffs were therefore not provided full or equal access to the Student's education record and hearing transcripts.

a. Per §300.501(a)(1) and (2) of IDEA 2004:

*"The parents of a child with a disability must be afforded, in accordance with the procedures of §§300.613 through 300.621, an opportunity to inspect and review all education records with respect to—*
*(1) The identification, evaluation, and educational placement of the child; and (2) The provision of FAPE to the child."*

b. The Hearing Officer denied equal access for both parties to the Hearing transcripts. The LEA received the transcripts, as per their expedited request, on the morning of December 24, 2019 at 9:54 a.m. But the LEA did not provide the transcripts to the Plaintiffs until after the Plaintiff's closing argument was submitted on 12/30/2020.(Attachment B).

c. The LEA counsel asserted their evidence was the complete education record. However, in the billing sheets submitted to the LEA, counsel documented and billed for hours to review 4,000 pages of the Student's education record in preparation of the hearing. Evidence presented by

LEA counsel at the Due Process Hearing was far less than 4000+ pages. LEA counsel wrote, "11/9/19 - review of extensive file material (4,000+ pages, in total) in order to prepare for drafting of answer to DPH). (Attachment C)

d.  LEA submitted a subpoena duces tecums for HIPAA-protected information, which the Hearing Officer quashed. However, the LEA submitted unsigned subpoenas to Plaintiff's medical professionals, which were then misinterpreted by some professionals who submitted information to the LEA. (Attachment D) The LEA's counsel did not provide notice to the Plaintiffs that they had obtained documents, nor which documents they obtained.

4.  The Hearing Officer determined at the prehearing conference to restrict the years the Plaintiffs could seek relief before the Plaintiffs could present their evidence at the hearing. He stated "it is the standard that's a two year limit, statute of limitations that is involved in these cases. (TR 8-12 p.25 12/2/19)

a.  IDEIA amends the IDEA in that it does contain an express statute of limitations for compensatory education but IDEIA is not retroactive. Also, IDEIA did not amend Section 504.

b.  When IDEIA is applied, the parents request for compensatory education occurs when (a)"parent was prevented from requesting a hearing due to specific misrepresentation by the local education agency ("LEA") that it had resolved the problem forming the basis of the complaint or (b) the local education agency's ("LEA") withholding of information from the parent that was required under this part to be provided to the parent" U.S.C 1415 (f) (3) (D)

5.  The Hearing Officer engaged in an ex parte telephone call with LEA counsel on 12/12/19 as evidenced on their billing sheet. (Attachment E).

6.  The Hearing Officer did not follow a timeline in the best interest of the Student. The Plaintiffs were allotted one day (that stretched into two days) for a hearing that would encompass the Student's educational years from Kindergarten to Ninth Grade. The Plaintiffs were denied the opportunity to fully present the burden of proof required of them.

7.  Although the request for Due Process contained 10 issues, the Hearing Officer determined only three issues would be addressed during the hearing. However his final decision did not adhere to his own set parameters. The Plaintiffs only prepared for the three issues he originally had determined, which left them at a disadvantage to provide their burden of proof in preparation of the hearing. (Attachment G).

8.  The Hearing Officer required proceedings to continue until 1:15 a.m on 12/20/19 and ignored the personal difficulties this decision inflicted on the Plaintiffs.

    a.  When parents stated a need to address childcare, the hearing officer was indifferent and specifically stated to the parent who expressed a need to go home to address childcare, "no one is holding you here...it's not required of you to be here." After 12 hours of proceedings the remaining Parent became ill and was challenged in being able to fully participate. After securing childcare the other Parent returned to the building at 10:00 p.m but was unable to access the building.  The Hearing Officer refused breaks or consideration of a continuance.

    b.  The Hearing Officer was aware the Plaintiffs' advocate was traveling back to Richmond, VA (two hours away) after the proceeding on 12/19/19, yet still continued to conduct the hearing until 1:15 a.m.

    c.  On December 19, 2019, the Hearing Officer allowed the Court Observer to leave around 5:30 p.m, although the proceeding did not end until 1:15 a.m the next morning. After the Court Observer left, the LEA counsel and representative became combative and accusatory of the Parents. The Hearing Officer did not address their behavior. (TR2 beginning pg. 389 w/SCH)

9.  The Hearing Officer did not provide substantive grounds in the decision he rendered. Per §1415 (f)(3)(E)"

    *"(E) Decision of hearing officer(i) In general Subject to clause (ii), a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education. (ii) Procedural issues In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—(I) impeded the child's right to a free appropriate*

*public education; (II) significantly impeded the parents' opportunity to participate
in the decision making process regarding the provision of a free appropriate
public education to the parents' child; or (III) caused a deprivation of
educational benefits."*

    a. The Hearing Officer didn't cite case law or regulation to justify his
       redefining and removal of the unique needs of Dyslexia from the
       protections of federal and Commonwealth law.

    b. The Hearing Officer asserts in his decision that Dyslexia is not a specific
       category of disability under IDEA. Therefore, the unique needs of that
       disability are irrelevant.

        i. Per the U.S. Department of Education's 10.23.15 "Dear
          Colleague" Letter:

            *"The purpose of this letter is to clarify that there is nothing in the
            IDEA that would prohibit the use of the terms dyslexia,
            dyscalculia, and dysgraphia in IDEA evaluation, eligibility
            determinations, or IEP documents. . . . In implementing the IDEA
            requirements discussed above, OSERS encourages SEAs and LEAs
            to consider situations where it would be appropriate to use the
            terms dyslexia, dyscalculia, or dysgraphia to describe and address
            the child's unique, identified needs through evaluation, eligibility,
            and IEP documents. OSERS further encourages States to review
            their policies, procedures, and practices to ensure that they do not
            prohibit the use of the terms dyslexia, dyscalculia, and dysgraphia
            in evaluations, eligibility, and IEP documents. Finally, in ensuring
            the provision of free appropriate public education, OSERS
            encourages SEAs to remind their LEAs of the importance of
            addressing the unique educational needs of children with specific
            learning disabilities resulting from dyslexia, dyscalculia, and
            dysgraphia during IEP Team meetings and other meetings with
            parents under IDEA."*

            https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/guidanc
            e-on-dyslexia-10-2015.pdf

        ii. Per §300.8 of IDEA and 8VAC20-81-10:

> *" 'Specific learning disability' means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction,* **dyslexia***, and developmental aphasia. . . . Dyslexia is distinguished from other learning disabilities due to its weakness occurring at the phonological level.*

iii.   The *Commonwealth of Virginia(§ 22.1-213 of the Code of Virginia; 34 CFR 300.8(c)(10))* chose to exceed the minimum descriptors of Dyslexia that is included in IDEA by adding the unique characteristics of Dyslexia in their regulations *"Dyslexia is distinguished from other learning disabilities due to its weakness occurring at the phonological level. Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge."*

c.   The LEA's Specific Learning Disability Basis For Committee Decision ("BCD") form specifically states Dyslexia *is a specific learning disability that is neurobiological in origin and distinguished from other learning disabilities due to its weakness occuring at the phonological level. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge* (SB 066-007)

d.  The Hearing Officer did not consider the facts as exhibited in evidence and testimony and instead accepted the contradictory opinion of the LEA's counsel that Dyslexia is just a medical diagnosis and not a unique specific learning disability as identified under federal and Commonwealth regulations, further deprived the Student of a FAPE.

    i.  The LEA has on record the medical diagnosis of Dyslexia from the Student's pediatrician that was provided on June 10, 2015 at the initial eligibility as well as an AIM Virginia reading disability (Dyslexia) certification endorsed by the pediatrician on June 16, 2017.

e.  The Hearing Officer accepted the LEA's continuation of a FAPE denial and disability discrimination toward the Student when he unilaterally decided the Student's Dyslexia is not interchangeable as the term "specific learning disorder" and is not in fact a unique specific learning disorder requiring additional definition. Recognized parameters to ensure the specialized service providers and a continuum of services and placement are made available in the provision of a FAPE are identified and recognized by both the federal and Virginia regulations and guidelines. The LEA has the information but denied protection and a FAPE to the Student. The LEA's website and in their Dyslexia handbook (SB 152-047) the following is documented:

> *"Continuum of Dyslexia-Dyslexia is a language-based reading disability. Dyslexia manifests on a continuum from mild to moderate to severe.The terms "dyslexia" and "specific reading disability" are often used interchangeably. The following definition, adopted by the International Dyslexia Association in 2002, is the definition recognized in Fairfax County Public Schools (FCPS). Key words in the definition are underlined and further described in the text that follows. In addition, the Appendix contains a glossary of terms. Dyslexia is a __specific learning__ __disability__ that is __neurobiological__ in origin. It is __characterized by__ difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities.*
>
> *These difficulties typically result from a deficit in the __phonological__ __component of language__ that is often __unexpected__ in relation to*

*other cognitive abilities and the provision of effective classroom instruction. **Secondary consequences** may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge"* (International Dyslexia Association, 2002) Dyslexia is;

**Specific learning disability:** *Dyslexia stems from a problem in a narrow area of development, rather than a global problem in overall development.*

**Neurobiological:** *Dyslexia is a brain-based disorder. Specific genes account for almost 80% of the differences found in the brains of students who demonstrate characteristics of dyslexia (Powers, et al., 2013). Brain imaging for students with dyslexia reveal that the centers for specific aspects of reading and specific pathways between these centers are unlike those of typically developing readers.*

*Students with dyslexia develop a less efficient pathway in the brain for word recognition, which causes the student to process written text differently. Due to these neurobiological differences, decoding is inefficient, fluency is compromised, and meaning can be lost (Shaywitz, 2003).*

**Characterized by:** *Students with dyslexia typically struggle to sound out new words when reading (decoding), and they typically struggle to represent sounds in words accurately when spelling (encoding). Some students with dyslexia may be accurate readers, particularly if they have had an intervention, but they still struggle with reading fluency, reading quickly and accurately. For people with severe dyslexia, even if oral language comprehension skills are intact, reading comprehension may be compromised.*

*See the section entitled, Characteristics and Signs of Dyslexia for more information.*

**Phonological component of language:** *Dyslexia is not characterized as a visual problem, but as a language problem. It*

*can be seen in the way words are pronounced, read, and/or spelled. Although a phonological deficit is typically present, weaknesses may also exist in other cognitive and linguistic abilities, such as rapid automatized naming.*

*__Unexpected__: Dyslexia is unexpected relative to the student's cognitive strengths and the type of instruction that has been provided. Sally Shaywitz (2003) refers to these skills as a "sea of strengths" that surrounds the reading and spelling deficit. Strengths such as problem solving, critical thinking, vocabulary and background knowledge can help students develop compensatory strategies which can then mask their difficulty with decoding.*

*__Secondary consequences__: While dyslexia is a targeted difficulty in the phonological component of language, it can impact the overall development of literacy skills. Because of difficulties with word reading and spelling, students can also struggle with reading comprehension and writing composition. Students can also experience social and emotional impacts, such as lack of motivation in reading and writing, anxiety, depression and/or a pattern of avoiding reading or writing tasks.*

### CONTINUUM OF DYSLEXIA

*Dyslexia exists on a continuum of severity and can occur in students at all levels of intelligence. For these reasons, it is not always immediately evident when an individual is actually presenting with characteristics of dyslexia. Due to strong cognitive abilities, some students are able to develop strategies to accurately identify words using other abilities to compensate for their poor word reading or slow reading rate. Some students may demonstrate less severe characteristics of dyslexia, causing them less difficulty when initially learning decoding skills. These students do not always require targeted reading remediation. However, those students with more severe forms of dyslexia do require targeted interventions focusing on phonemic awareness, word identification, and/or fluency.*

*Dyslexia affects some people more than others, meaning that the impact of dyslexia can differ from one student to the next. Because it manifests differently on the mild end of the continuum than it does on the severe end of the continuum, signs and symptoms can vary. There are a variety of factors that can affect the severity of dyslexia. This continuum from mild to severe helps to explain why dyslexia is not always easy to identify, why students with dyslexia need different levels of intensity of intervention, and why they may respond differently to these interventions.*

*Although phonological processing deficits are the most characteristic difficulty related to dyslexia, not all students with dyslexia have a phonological deficit. Students with dyslexia may have weaknesses in rapid automatized naming, or the ability to name objects and symbols quickly and accurately; orthographic mapping, establishing the connections between the speech sounds and the written letters; processing speed, visually scanning symbols quickly; and/or working memory, apprehending and then reorganizing information mentally. Students with weaknesses in more than one of these areas tend to have more severe dyslexia.*

### *MILD DYSLEXIA*

*Neurologically, dyslexia is characterized as inefficient and/or inaccurate processing of the sounds in words when speaking, reading or writing. Positive environmental factors, such as access to a rich oral language early literacy environment and strong early literacy instruction or intervention, can lessen the impact of dyslexia on learning to read. These early experiences can create more efficient pathways in the brain needed for automatic processing of the sounds in the written word (Aylward et al., 2003).*

*Dyslexia may be mild if the source of dyslexia is a lack of automaticity in retrieving information from long term memory. Dyslexia may also be mild if the related factors, such as phonological and/or rapid automatized naming deficits, are mild.*

*Finally, dyslexia may appear to be mild because of the cognitive strengths a given individual with dyslexia may have. Strengths in vocabulary, reasoning, problem solving, or oral language comprehension (described by Shaywitz as a "sea of strengths") can mediate the severity of dyslexia.*

*Students with strong oral language skills can often develop average reading skills which can then make their dyslexia more difficult to identify. They can also better compensate for their weaknesses, thus keeping the dyslexia "hidden."*

### MODERATE DYSLEXIA

*Shaywitz's "sea of strengths" model can help to explain why mild dyslexia may be overlooked by families and educators (Shaywitz, 2003). However, it is important to note that not all students with dyslexia will have these strengths, nor will all students with dyslexia present with above average cognitive skills. Dyslexia occurs evenly across the population, and is not unique to people with average or above intelligence. Average or above intelligence, however, can help facilitate the process of learning to read, as well as the student's rate of response to intervention.*

*Dyslexia is often experienced with moderate impact on reading achievement when phonological challenges are paired with rapid naming deficits, referred to as the "double deficit" hypothesis (Wolf & Bowers, 1999). Students with a "double-deficit" often have more difficulty learning to read. Once reading accuracy is established, often through a structured multisensory phonics approach, interventions must be used to increase reading fluency and rate.*

*Co-existing conditions, such as attention-deficit/hyperactivity disorder (ADHD) or dysgraphia, can also increase dyslexia's impact on behavior or academic performance, and can lessen the positive impact of early intervention... Co-existing conditions may lead to a more moderate (vs. mild) expression of dyslexia. The section entitled, Common Co-existing Conditions with Dyslexia*

*explains more about the most common disorders that accompany dyslexia.*

### *SEVERE DYSLEXIA*

*Many students with dyslexia have phonological processing deficits. Students who have additional challenges or other cognitive and linguistic weaknesses (e.g., orthographic mapping, processing speed, rapid automatized naming, working memory, and/or executive functioning) will often experience a more severe form of dyslexia.*

*Dyslexia impacts accurate and fluent word recognition. While mild or moderate dyslexia often impacts automatic word recognition, severe dyslexia impacts automatic word recognition to such a degree that comprehension of text is often compromised as well. In much the same way, while mild or moderate dyslexia often impacts spelling, severe dyslexia impacts spelling to such a degree that, even with accommodations, students may have difficulty expressing their thoughts in writing.*

*Finally, students who demonstrate more severe dyslexia often have family histories of language, reading, and writing difficulties. Genes account for at least 80% of individuals with this reading disorder (Powers et al., 2013).*

### *REFERENCES*

*1.Aylward E.H., Richards T.L., Berninger V.W., Nagy W.E., Field K.M., Grimme A.C., Richards A.L., Thomson J.B., & Cramer S.C. (2003). Instructional treatment associated with changes in brain activation in children with dyslexia. Neurology, 61, 212–219. 2.Powers N, Eicher J, Butter F, Kong, Y., Miller, L., Ring, S., Mann, M., & Gruen, J. (2013). Alleles of a Polymorphic ETV6 Binding Site in DCDC2 Confer Risk of Reading and Language Impairment. The American Journal of Human Genetics, 93, 19–28; July 11, 2013.*

3.Shaywitz, S. (2003). *Overcoming Dyslexia: A new and complete science-based program for reading problems at any level. New York, NY: Knopf.*

4.Wolf, M. & Bowers, P. (1999). *The double-deficit hypothesis for the developmental dyslexias. Journal of Educational Psychology, 91, 415-438.*

f.   The Hearing Officer accepted the LEA counsel's representation of a Dyslexia specialist as only a "*resource*" and not required as an expert to provide direct and indirect services to include evaluation and IEP development in meeting the unique and specialized needs of the Student. (Attachment M )

   i.   Per Virginia regulation § 22.1-213 of the Code of Virginia; 34 CFR 300.8(c)(10):  *One reading specialist employed by each local school board that employs a reading specialist shall have training in the identification of and the appropriate interventions, accommodations, and teaching techniques for students with dyslexia or a related disorder and shall serve as an advisor on dyslexia and related disorders. Such reading specialist shall have an understanding of the definition of dyslexia and a working knowledge of (i) techniques to help a student on the continuum of skills with dyslexia; (ii) dyslexia characteristics that may manifest at different ages and grade levels; (iii) the basic foundation of the keys to reading, including multisensory, explicit, systemic, and structured reading instruction; and (iv) appropriate interventions, accommodations, and assistive technology supports for students with dyslexia.*

   ii.   Per 34 C.F.R. § 300.34(a):  *"related services include other supportive services that are required to assist a child with a disability to benefit from special education…" the list of services in § 300.34 is not exhaustive and may include other developmental, corrective, or supportive services if they are required to assist a child with a disability to benefit from special education.*

Per VDOE's standards for identifying direct and indirect needs, Dyslexia does fall under a required category if the direct or indirect services are required to meet the student's needs.
See:
http://www.doe.virginia.gov/special_ed/iep_instruct_svcs/stds-based_iep/training_modules/module_5_identifying_special_ed_related_services.pptx

g.  The Hearing Officer did not consider the cumulative evidence of fact, as stated above, that Dyslexia is identified as it presents uniquely for every student and as a result there is an identified continuum of Dyslexia which the LEA has accepted for every other student except for the Plaintiffs upon which the Due Process was held for. Such discrimination and denial of a FAPE has not allowed this Student equal access and protections afforded under Federal and Commonwealth law.

10. The Hearing Officer denied the Student equal access and educational opportunity when he ruled the current grade of 'F' in foreign language (Spanish) the Student had at the time of Due Process did not warrant a need for indirect services from the Dyslexia specialist because it "was not a final grade."

a.  VDOE developed the document "Supporting World Language Learning for Students with Disabilities" specifically because of the large number of students with SLDs who were either 1) failing a world language and/or 2) not attempting to take a world language due to difficulties related to being students with SLDs. The document specifically states lack of training of teachers as one of the biggest hurdles students with Dyslexia face, hence the need for indirect services. In addition, it also states:

*"Access to foreign language has been recognized as a challenge to students with SLD, especially those who have been identified with a reading disability or a condition such as dyslexia (https://dyslexiaida.org/fact-sheets/)."* See:
http://www.doe.virginia.gov/instruction/foreign_language/resources/world-language-swd.pdf

b.  The Hearing Officer deemed the Plaintiffs concerns with the Student's foreign language grade as merely "speculation that he will fail." without support from indirect services. The Hearing Officer further opined, "Students' struggle with Spanish class is not a strong indicator of any

inadequacy with the IEP as student's with SLD often struggle with a second language. The Parent's ambition that the Student graduate with an Advanced Studies Diploma is the cause of this predicament for the Student."

11. The Hearing Officer enforced the continued denial of Plaintiff's rights to parental and student participation in the educational decision making. The Student aspires to attain post secondary educational goals and a career in the animal sciences. The Hearing Officer's decision wrongfully blamed the Parents as the "cause of the predicament" for a denial of FAPE because they are merely advocating for the Student's Constitutional right to an education that is protected under Federal and Commonwealth law. Such an opinion has allowed for the continuation of the discriminatory tracking actions the LEA has imposed on the Student. Thus, denying equal access to educational opportunities nondisabled peers are provided.

12. The Hearing Officer failed to consider that in Goss v. Lopez (1975), the Supreme Court held that education is a property right protected by the 14th amendment. The Hearing Officer's determination of the Student's academic track and inappropriate placement and settings of services is an infringement of the Student's property interest. The deprivation of a fair and impartial due process imposed by the Hearing Officer as well as his labeling of the Student as "standard diploma track" education has stigmatized the Student and interfered with the right to acquire property, ultimately, denying the Student equal protection under the law.

13. The Hearing Officer's decision to redefine the Student's current educational setting in the least restrictive environment,from a"team taught" English class to a self-contained setting and not the general education setting, exemplifies the rigidity of understanding to the continuum of the Least Restrictive Environment and the Student's Rights afforded to him by the 14th amendment, 504, ADA, IDEA, sec. 1983 and ESSA. Furthermore, the tracking practices also known as grouping and pathways that the Student has endured without merit has limited and denied him equal opportunity to access the educational curriculum and opportunities afforded to his non-disabled peers. Research indicates that self-contained classes based on ability ( TR Day 2 P 581 20-21 ) level do not improve school achievement. In contrast, it lowers self esteem and educational aspirations for students placed in lower tracks (R.P.Ross & Harrison, 2006)

14. The Hearing Officer negated to consider the data that students with disabilities continue to be overrepresented in the lower tracking system put into place by an unyielding an inflexible continuum of so called "placement and settings" of the general education and special education classes. In Hobson v. Hanson (1967,1969) the disproportionate assignment of children to lower ability tracks offered inferior educational opportunities. Thus, placement of a child with a disability without the adherence to the protections afforded by the procedural safeguards, regulations, and rights that are explicitly assigned for the disabled Students and Parents in the IDEA, ADA, 504, ESSA, sec. 1983 and 14th amendment violates the very core of their purpose.

15. Both the LEA and Hearing Officer negated to evidence the lower tracked "self contained" instructional setting and placement as well the Standard Diploma track resulted in better educational opportunities, than the Student's nondisabled peers accessing and receiving educational benefit from honors level, foreign language classes, Advanced Placement, and Advanced Diploma track. In fact the data reported by the LEA and Virginia Department of Education on the educational outcomes of Students with disabilities is grim. In the Student's LEA, only 16.1% of students with disabilities achieve an advanced diploma, compared to 61.5% of the nondisabled student population. (Attachment F)

16. The Hearing Officer did not question and address the inequalities of access to educational opportunities within the LEA as testified by the Parent. The Parent testified the Student's school does not have equal opportunities available in their continuum of placement nor do they offer equal access to course offerings by allowing different course availability for each school to take place. This is also evidenced in each of the course selections from schools in the LEA. The Student's base/neighborhood school only has the most restrictive educational setting for their proposed electives and that is "self contained." (Attachment F, TR 1 )

17. The Hearing Officer exhibited incorrect understanding of the differences between team-taught and self-contained classrooms when he incorrectly defined and created a placement change by documenting the Student's current inclusive instructional "team-taught" placement setting of special education services in a "general education" setting to special education services in special education instructional placement setting, which the HO referred to as "self contained." The Student was never and is not in a "self contained" English 7, 8 or 9 instructional placement setting.

18. Per § 1415(f)(1)(B), Resolution Session: *"(i) Preliminary meeting Prior to the opportunity for an impartial due process hearing under subparagraph (A), the **local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint**— (III) which may not include an attorney of the local educational agency unless the parent is accompanied by an attorney"*

    a. The LEA did not "convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint." The November 14, 2019 resolution phone call meeting was attended by LEA upper level, central office administrators, none of whom have "specific knowledge of the facts" since none have ever: 1) worked with The Student; 2) assessed him; 3) have the specialized training in meeting his unique disability based needs; or 4) were a Dyslexia specialist as defined and required by § 22.1-213 of the Code of Virginia; 34 CFR 300.8(c)(10).

    b. The LEA unilaterally decided to end the resolution phone call held on November 14, 2019 without consideration of the Parents requests to continue, nor did the LEA attempt to schedule a time/date to continue the phone call.

## II.  §300.101(a)(b)(c) Free Appropriate Public Education (FAPE) (§ 22 .1-214 of the Code of Virginia; 34 CFR 300 .2, 34 CFR 300 .101, 34 CFR 300 .124 and 34 CFR 300 .209), ADA, 504, ESSA, Sec. 1983, Equal Protection Clause

- *Per §1412(a)(1) of IDEA 2004:*
  *"(a) free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school."*

    1. The Student was denied the opportunity for an initial special education evaluation in 2010 and again in 2013. The LEA had a suspicion of disability but did not evaluate or convene a local screening meeting.

    2. In the internal document "Hot Topics", FCPS admitted problems with "dyslexia and fidelity of instruction" in the Robinson pyramid in which Student attended: (Attachment H)

*"Lack of acceptance of Dyslexia by teachers"* was noted in Attachment H for the Robinson Pyramid.

In addition, Attachment H notes:

*"Dyslexia and fidelity of instruction continue to be significant concerns across the division. In the Lake Braddock pyramid, there were four significant cases where elementary school students with dyslexia did not receive adequate reading instruction, did not make progress over time, and were subsequently placed in private day placements with some parental reimbursement by FCPS. In the Robinson pyramid, there were several cases with similar concerns. Several appeals were filed due to difficulties at local screening and eligibility for students with dyslexia, including two administrative reviews at Laurel Ridge and one at Fairview."*

3. Per §300.101(b) of IDEA 2004:  *(b) FAPE for children beginning at age 3.(1) Each State must ensure that—(i) The obligation to make FAPE available to each eligible child residing in the State begins no later than the child's third birthday; and(ii) An IEP or an IFSP is in effect for the child by that date, in accordance with §300.323(b).(2) If a child's third birthday occurs during the summer, the child's IEP Team shall determine the date when services under the IEP or IFSP will begin.*

4. Per §300.101(b) of IDEA 2004:  *(b) FAPE for children beginning at age 3.(1) Each State must ensure that—(i) The obligation to make FAPE available to each eligible child residing in the State begins no later than the child's third birthday; and(ii) An IEP or an IFSP is in effect for the child by that date, in accordance with §300.323(b).(2) If a child's third birthday occurs during the summer, the child's IEP Team shall determine the date when services under the IEP or IFSP will begin.*

    a. The Student did not receive an IEP until June 10, 2015 of fourth grade, after being denied an evaluation numerous time before.

5. Per §300.101(c) of IDEA 2004: *(c) Children advancing from grade to grade.(1) Each State must ensure that FAPE is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade.(2) The determination that a child described in paragraph (a) of this section is eligible under this part, must be made on an individual basis by the group responsible within the child's LEA for making eligibility determinations.*

    a. The LEA and its legal counsel, Blankenship and Keith, have routinely stated the Student's grades as evidence of progress and, thus, reasons not to provide specific services and delay in the identification of needs and services.

        i. On May 9, 2018, an IEP meeting was held to develop an annual IEP from the reevaluation meeting from 4/5/2018. The LEA stated (SB Audio 5/9/2018) they had no reason to believe the Student required specialized services to address his specific learning disabilities in reading and writing (Dyslexia) because he met grade level expectations. The LEA reported (SB Audio 5/9/2018) they can only speak from September 2017 to May 9, 2018 as to why he was not provided services to address those disability based needs prior to this meeting. The LEA reported (SB Audio 5/9/2018) he achieved grade level scores on all LEA-Wide assessments and that is why he did not have his specific learning disability needs (Dyslexia) addressed in previous IEP's and eligibility. However, on LEA-Wide assessments mandated by the Every Student Succeeds Act, the Student achieved a score of 28% on the Language Arts/Reading Grade 7 assessment dated December 11, 2017. That data was reported to the grade level teacher and the school intervention specialists, but they did not contact the Parents, place it in the education file, or initiate any tiered interventional instruction (Response to Intervention/ Multi-Tiered System of Support). That data was also withheld from the Parents and it was not reported or considered on any IEP, PWN, reevaluation, or eligibility documents. Parents repeatedly requested this assessment data and was told it either did not exist or it was missing.  Only after the Due Process Hearing and the Hearing Officer's decision was rendered, did the LEA's FOIA officer email the Student's

ECART/Horizon LEA-Wide Assessment data from 2014 to
January, 2020 on January 30, 2020 to the Parents. (Attachment I)

b. (SB Audio 5/9/2018) "We do not because it was not an area of need until
we have the IEE in December. We did not take baseline data, which was
not part of our English seven curriculum to do fluency encoding or
decoding and it wasn't identified as an area of need on his IEP that came to
us based from the summer clinic testing." Parents "So my question is,
how come then from the summer clinic testing weren't the full battery of
tests administered?" LEA "you would have to ask those specific testers.
We can't speak to that-you would have to ask those specific testers."
Parents "Why weren't these identified in the summer clinic testing…, I
questioned his reading ability and his spelling ability. Then, I was told that
he was quote unquote, grade level…, So then are we saying that he has
regressed in these areas between their testing in July and now?…, all of a
sudden he has such a deficit…, areas of concern were brought up. He was
not tested in those areas, nor was he given the full battery of the KTEA-3
(Educational July 2017)". LEA "Yeah, well, unfortunately, we don't have
any control of what the summer clinic (LEA Special Education Clinic)
people did."

6. The Hearing Officer ruled the current grade of 'F' in foreign language (Spanish)
the Student had at the time of Due Process did not warrant a need for indirect
services from the Dyslexia specialist because it "was not a final grade." The
Hearing Officer deemed the Plaintiffs concerns as merely "speculation that he
will fail" without support from indirect services. The Hearing Officer further
opined, "Students' struggle with Spanish class is not a strong indicator of any
inadequacy with the IEP as student's with SLD often struggle with a second
language. The Parent's ambition that the Student graduate with an Advanced
Studies Diploma is the cause of this predicament for the Student." (Attachment A,
J)

**III. U.S.C 1414 U.S.C 1415 §300.111(a) and (c) Child Find , ADA, 504, sec. 1983, Equal
Protection Clause, ESSA**(34 CFR 300 .102 and 34 CFR 300 .111)  (34 CFR 300 .124)(34 CFR
300 .131, 34 CFR 300 .133, 34 CFR 300 .134) f 8VAC20250-10 . (§ 22 .1-273 of the Code of
Virginia)  8VAC20250-10 . (§ 22 .1-273 of the Code of Virginia)(34 CFR 300 .507)
8VAC20-81-170 (34 CFR 300 .307)  (34 CFR 300 .309)

- (a) General.(1) The State must have in effect policies and procedures to ensure that (i) All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State, and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated; and(ii) A practical method is developed and implemented to determine which children are currently receiving needed special education and related services.(c) Other children in child find. Child find also must include (1) Children who are suspected of being a child with a disability under §300.8 and in need of special education, even though they are advancing from grade to grade. 34 CFR 300.307(a) 8VAC20-81-170

1. The Student did not receive an IEP until June of fourth grade. Although one of the Student's parents was a special education teacher and trained in identifying children with disabilities, FCPS chose to ignore her input and not evaluate Student prior to that.

2. The LEA had a basis of knowledge of suspected and identified disabilities documented in the education records as well as teacher comments as early as Kindergarten from both private evaluations and their own assessments and evaluations. (SB005-001,006-002,006-001,010-003,014-001,015-001,020-001,028-001,029-0 01,029-005,030-002,051-001,052-001 SB Audio (6/17/17, 6/27/17, 8/23/17) P 5,9,10) (Attachment R)

3. The Student first entered the LEA as a Kindergarten student. Parents first expressed concerns to FCPS regarding their child's difficulty with fine motor dexterity in Kindergarten when he was unable to form and produce written letters, effectively manipulate a writing tool and complete written tasks at the same rate as his peers. His Kindergarten teacher reported and noted on the report card Student had difficulty with fine motor dexterity and completing writing tasks at the same rate as peers. (Attachment R)

   a. The Student exhibited difficulties in rhyming and identifying sound to symbol tasks and recalling numbers when tasked to write them.

   b. The Parent sought consultation with both the FCPS Speech and Language Clinician and the Occupational Therapist for assistance and support of the reported phonological, fine motor dexterity, and handwriting weaknesses the Parents and Kindergarten teacher observed.

    c. The Parent provided Handwriting Without Tears program, Earobics (audiological & phonological intervention), reading and spelling instruction as well a variety of word play activities.

    d. The LEA asserted the Student was too young to evaluate and identify a disability and need for services at that time.

    e. The Student continued to demonstrate difficulty with manipulating a writing tool as well as scissors in a time frame as his peers.

    f. The Student continued to demonstrate difficulty in identifying letters to sounds in written and oral tasks.

4. In August, 2013 the Parents conferenced with the LEA's Principal and shared they suspected the Student could have a learning disability (Dyslexia), fine motor dexterity difficulties, difficulties in copying information, as well as following multistep directions.

5. In November, 2013 the third-grade teacher initiated a reading fluency intervention called Read Naturally. The Student was expected to hear an audio of a passage and then read it independently on his own for practice.The Parent provided support at home with private interventions and direct instruction.

6. The 2013-2014 Student LEA-Wide data was not available at the June 10, 2015 eligibility and it continues to be missing from the education record.

    a. Student was not reported as being assessed by the required LEA-Wide 2013-2014 ECART/Horizon standards-based assessments in math and English Language Arts.

    b. The Student's LEA-Wide Developmental Reading Assessment performance data is not available or reported and has not been maintained in the education record.

    c. The Student's Developmental Spelling Assessment performance data is not available or reported and has not been maintained in the education record.

7.  In November 2014 (fourth grade) the Student was not proficient on Division Wide ECART/Horizon assessments—English Language Arts as per an email from the teacher. The teacher verbally reported a score of 50% in an email. It was not maintained in the Student's education record and nor provided on the multiple FERPA, FOIA and subpoena attempts. On **January 30, 2020** the Parent received a copy after the Due Process Hearing Officer's Decision was rendered. Prior to that date, the assessments were reported as "missing" and "could not retrieve what does not exist" by the administration and LEA FOIA officer. The Student had a core of 57% Quarter 1 and 50% Quarter 2.

    a.  A Division-Wide ECART/Horizon assessment in mathematics was not reported to the Parents, local screening committee, eligibility committee or maintained in the education record.  The data was concealed until **January 30, 2020** (via FOIA request by Parents). The Student was not proficient with a score of 50% (11/25/14) but the teacher reported on the quarterly report card a 3 out 4 mastery for that Quarter. (SB 004-001)

    b.  The Student continued to exhibit difficulties in reading, spelling, written expression, handwriting and math fluency. (SB 004-001)

    c.  During a Parent teacher conference, the Parents reported their concerns again to the teacher that the Student may have a learning disability (Dyslexia), fine motor concerns, math fluency, following multistep directions, and suspected auditory discrimination weaknesses. The teacher expressed she felt the Student needed to exert more effort.

    d.  Private audiological assessment conducted on 10/24/14 reported normal hearing but reported an SRT in quiet reception as 5 in the right ear and 0 in the left and a 96 in the right ear and 100 in the left. The LEA did not include an audiologist as part of the local screening team, eligibility committee or IEP team. As a result, there was no representative to interpret and consider the results of the evaluation (First attendance by the LEA audiologist was August 22, 2020). (SB 005-001)

    e.  Private audiological evaluation notes on the bottom "pursue APD (auditory processing disorder) if concerns persist. The LEA did not provide one or consider the need for an APD evaluation. (SB 005-001)

f.   Due to continued concerns, in December of 2014 the Parents had a private psychological and educational evaluation conducted. The Student received diagnoses in specific learning disability with impairments in reading and writing (DSM criteria met for Dyslexia) as well as ADHD combined type. The Parents held a conference with the teacher January 2015 and shared the results of the private psychoeducational evaluation.

g.   Multi-Tiered Systems of Support (MTSS) Interventions were not provided by the LEA nor was a representative that could speak to those services made available at the IEP meetings. The Parents requested information regarding MTSS but was either told no one knew or they simply received no response. On January 30, 2020, after the Hearing Officer's decision, the Parent received via FOIA request only some of the English Language Arts and Mathematics Division-Wide screening assessments. The Student had in fact failed these assessments and did not meet benchmark as the LEA had falsely reported the Student grade level in grades 3-9. On March 10, 2020, in the presence of the LEA counsel, the Coordinator of Special Education Instruction, confirmed performance on those assessments should have triggered immediate MTSS services and monitoring of the Student. (SB 006-002) (Attachment I)

h.   In 2015 (Student's 4th grade year) the teacher emailed the Parent the current spelling assessment data (Developmental Spelling Assessment) and wrote "From: i1@fcps.edu>Sent: Wednesday, February 25, 2015 4:00 PM   He is in the early stages of Within Word patterns, specifically long and other vowel patterns"   The early stages of Within Word pattern is the 1st grade level. The LEA knew the Student was spelling below grade level and failed to act on this information.

i.   The Parent paid private tutors that provided direct instruction in the Just Words Reading Program, private speech and language therapy, and repeated readings to address fluency and metacognitive strategies. (SB 006-002).

     i.   The Parent was misinformed by the LEA as an employee and Parent that the Just Words Program was evidence-based in meeting the needs of students with Dyslexia. The LEA's Office of Special Education Instruction reported and continues to falsely report and train the Just Words program can meet the needs of Dyslexic

students. This contradicts the developer's reporting and statement that Just Words is not recommended for instructing Dyslexic Students.  (Attachment N)

j.   The Student's 4th grade teacher's discriminatory views further delayed his identification as a Student with a disability. She opined  the Student was "lazy" even after she had been made aware of the diagnosed disabilities in the private psychological and educational evaluation. The teacher documented her discriminatory view of the Student on the Educational Impact Questionnaire (Q#13) (SB FCPS 015-001)

k.   The Local Screening Committee, on April 22,2015, did not permit evaluations in all areas of suspected disability nor did they have all the necessary providers to speak to areas of suspected disability. They did not provide or consider Speech and Language, Audiological, Occupational Therapy, and Assistive Technology evaluations. An audiologist, Occupational Therapist, Speech and Language Clinician, and assistive technology specialist were not in attendance.

**IV. U.S.C 1415 U.S.C 1414, 504, ADA, sec.1983, ESSA Equal protection Clause**
**Independent Educational Evaluation  §300.502 , ADA, 504**

1.   On 4/5/18, the LEA held a reevaluation, eligibility and IEP addendum meeting. The LEA denied the Plaintiffs an assistive technology IEE without explanation. (Audio SB 4/5/18).

2.   On 4/5/18, the Plaintiffs expressed their concern and need for the Student to have auditory discrimination evaluation, but this concern was dismissed by the LEA and the Student was not evaluated in that area of suspected need/disability. (Audio SB 4/5/18) Neither the LEA nor an approved IEE Neuropsychological provider fully evaluated the area of auditory discrimination. An LEA audiologist did not attend an IEP meeting until August 2019.

3.   The LEA imposes the condition upon IEE evaluators in their Guidelines for Independent Educational Evaluations- "Prior to evaluating the student, evaluators are required to

discuss the evaluation with an LEA due process and eligibility specialist to ensure that
…, that the scope of the evaluation does not fall short NOR exceed that of the evaluation
in question." As a result, evaluators are limited by the perception of a due process and
eligibility administrator's decision as to what is too little and too much as needed to
comprehensively evaluate a student. (Attachment O)

4. The LEA did not ensure the publicly funded Neuropsychological IEE accurately reported
the scores or that the school psychologist verified those scores and correctly reported
them to the Plaintiffs and LEA teams.

5. The LEA guidelines state that: All tests must be administered and scored in accordance
with the instructions in the test manual, all tests and subtests which comprise a scale or
cluster must be administered and standard scores for the scale or cluster must be reported,
the evaluator must practice within a fifty-mile radius of Fairfax County, Virginia and be
certified in Virginia, Maryland or LEA of Columbia, and all scores are to be reported and
provided within the body of the report or in an attached appendix.

   a. The publicly funded Neuropsychological IEE incorrectly reported multiple scores
   and the wrong guide to interpretation was provided as it implies to be universal
   for all of the reported tests in the evaluation. On the Comprehensive Test of
   Phonological Awareness the Student is reported as average when he is in fact
   below average according to the publisher's normative scores and interpretive
   descriptors. At the 3/10/2020 IEP, the school psychologist continued to
   incorrectly advise the LEA IEP team and Plaintiffs that all tests utilize the same
   interpretive descriptors and normative parameters of the WISC-V. The Plaintiffs
   asked for the written guidance and literature to confirm and it has not been
   provided. This request occurred in the presence of LEA counsel attending that
   IEP meeting. The Plaintiffs requested all IEP's, Prior Written Notices, and
   reevaluation and eligibility documents be updated with the correct scores but were
   denied in the presence of LEA counsel.

   b. Due to such restrictions, the Plaintiffs have not been able to have the publicly
   funded assistive technology IEE completed because the provider they chose is not
   in the 50 mile radius as dictated by the LEA.

   c. In August 2019, the Plaintiffs requested an IEE for reading, writing and spelling
   because they did not agree with the LEA's evaluations March 2018, August 2018,
   and May 2019. The LEA denied the Plaintiff's requests.

**V. 20 U.S.C 1414, ADA, 504, Sec. 1983, Equal Protection Clause, ESSA**

**Eligibility, Reevaluation and Educational Need** 34 CFR 300.306 through 34 CFR 300.311, 8VAC20-81-170 34 CFR 300.307(b) 34 CFR 300.307 34 CFR 300.307 and 34 CFR 300.309 8VAC20-81-10 8VAC20-81-70 34 CFR 300.307(a) 8VAC20-81-10 8VAC20-81-170 (34 CFR 300 .175) (34 CFR 300 .305) (34 CFR 300 .306 through 34 CFR 300 .311)8VAC20-81-170 (34 CFR 300 .34 and 34 CFR 300.306(c)(2))§ 1111(b)(8)(D) and (E) of the ESEA (34 CFR 300 .307)(34 CFR 300 .307 and 34 CFR 300.309) 8VAC20-81-10 8VAC20-81-10 (34 CFR 300.307(a)) 8VAC20-81-70 (34 CFR 300 .110)

**Individualized Education Programs, Educational Placements and the Least Restrictive Environment** (34 CFR 300 .120 § 1111(b)(2)(C) of the ESEA, 20 USC § 6311) § 1119(a)(2) of the ESEA (34 CFR 300 .156(e)) § 1111(b)(2) (C)(v)(II)(cc) of the ESEA, 20 USC § 631 § 1111(h) of the ESEA . (34 CFR 300 .157(b) and (c)) (34 CFR 300 .175) 8VAC20-671-490 8VAC20-131-30 8VAC20-671-450 (34 CFR 300 .121 and 34 CFR 300 .150) (34 CFR 300 .105) (34 CFR 300 .105) (34 CFR 300.323(a)) (34 CFR 300.323(c)) (34 CFR 300.323(d)) (34 CFR 300.321(a), (c) and (d)) 34 CFR 300.323 (c)(2)(34 CFR 300.321(b))

**Procedural Safeguards Informed Consent  Parent Participation** (34 CFR 300 .300(c) and (d)) (34 CFR 300 .9) (20 USC § 1232g(a)(3); § 22 .1-289 of the Code of Virginia; 34 CFR 300 .611(b))(20 USC § 9501(18); 34 CFR 300 .35) (34 CFR 300 .42)(34 CFR 300 .43) (34 CFR 300 .34(c)(15)) ADA, 504

1. Parents were not provided a meeting notice for the Local Screening meeting or Eligibility meeting held on June 10, 2015. An IEP meeting took place directly after the eligibility meeting on June 10, 2015. The LEA did not give the Parent a copy of that meeting notice dated June 10, 2015. (SB 017-18, SB 017-19)

    a. Related Service Providers were not in attendance, although areas of suspected disability were of a concern.( An audiologist, Occupational Therapist, Speech and Language Clinician, and assistive technology specialist were not in attendance) (SB 017-001)

    b. The LEA did not provide a Prior Written Notice for the April 22, 2015 Local Screening and evaluation proposal.

    c. The LEA eligibility committee (Psychologist, Social Worker, Principal, Special Education Department Chair, General Education Teacher) met on June 10,2015 and found the Student eligible as a student with Other Health Impairment due to a

diagnosis of ADHD combined type but did not conduct a basis for Committee Decision to determine eligibility as a student with a Specific Learning Disability.(SB 016-001)

    d.  The LEA did not document the private Psyhoeducational data to base their decisions for eligibility criteria. (SB 016-003, 004, 005)

    e.  The LEA did document some of the data from their educational KTEA 2 testing which was an outdated version of that assessment.(SB 016-005, SB 010-001).

    f.  The June 10, 2015 IEP did not address all the Student's disability based unique needs. A basic floor of opportunity was not provided (SB 017-001 to 017). A Present Level of Functioning was not developed with full consideration of all evaluations and data was concealed. (SB 017-001 to 017)

    g.  The Parents consented to an "expedited" Assistive Technology evaluation on June 19, 2017 to take place prior to the student transitioning to middle school. Fairfax County Public Schools failed to provide this evaluation until October of 2017, after the Student had already started seventh grade and after the IEP meeting that took place prior to the start of school on August 23, 2017.

2.  The LEA has never considered whether the Student requires indirect services to address his needs, nor has it informed the Parents that such services existed or the Student might require them in order to receive a FAPE.

3.  The LEA did not inform the parent of the percentage of time the Student will be with disabled and nondisabled peers from June, 2015 - August 22, 2019. (SB 017-001 to 017, SB 021-001 to 018, SB 025-001 to 013, SB 031-001 to 016, SB 037-001 to 023, 047-001 to 023, SB 086-008 to 053, SB 102-002 to 035, SB 110-001 to 036, SB 117-001 to 036, SB 120-001 to 038, SB 121-001 to 041, SB 129-001 to 042)

4.  The LEA does not provide a service delivery instructional placement setting as Other Health Impairment in either a general education setting or special education setting. The LEA only provides the following instructional service delivery options as stated in the IEP 320 Services Page:

- APE Adapted PE
- ED Emotional Disabilities
- PD Physical Disability

- LD Learning Disability
- ID Intellectual Disability
- IDS Intellectual Disability Severe
- PAC Preschool Autism Class
- PSCB Preschool Class Based Program
- PRP Preschool Resource Program
- SL Speech and Language
- VI Vision Impairment
- HI Hearing Impairment
- NCE Noncategorical Elementary
- AUT Autism
- **Secondary Students Only**
  - Academy Support
  - ETR Employment and Transition Representative
  - OTP Office Technology and Procedures
  - Special Education Career Center
  - WAT Work Awareness and Transition
- **Additional/Related Services**
  - **Audiol** Audiology
  - OM Orientation and Mobility Coun Counseling
  - OT Occupational Therapy
  - Nurs Nursing
  - PT Physical Therapy

b. By negating to provide a service delivery setting for Other Health Impairment, the Student was denied a basic threshold of specialized educational setting designed to meet the disabilities unique needs.

5. The Student was discriminated against due to the LEA denial to "take appropriate action to ensure that students with ADHD receive the protections to which they are entitled under Federal law," by ensuring equal access to specialized instructional settings in a continuum of placements. Every IEP from June, 2015 to the current replicates the denial of equal educational opportunity and benefit of a FAPE. (OCR Dear Colleague, July 26, 2016) (P23) (SB 017-001-017, 021-001-017, 025-002-013, SB 031-001-016, 037-001, SB 037-020, SB 047-020,102-032,SB 110-033, SB 117-033, SB 120-035, SB 121-038, SB 129-039 )

6. The Student qualified to participate in the LEA's intervention and multi-tiered system of support (MTSS) program, but has been denied the opportunity from 2013-to the present.

The Student's District-wide screening assessments in mathematics, reading and English Language Arts from 3rd grade - present (Attachment I) were concealed by the LEA and nor documented in the education record. The Student did not achieve grade level expectations which would have provided intervention support had those scores been reported by the LEA.  (SB 017-001-017, 021-001-017, 025-002-013, SB 031-001-016, 037-001, SB 037-020, SB 047-020,102-032,SB 110-033, SB 117-033, SB 120-035, SB 121-038, SB 129-039 )

    a.  The Parents were not informed of such LEA's intervention and multi-tiered system of  support service as an educational opportunity nor were representatives made available at the eligibility meetings or IEP meetings to provide input in the development of the IEP. (SB 017-001-017) (P 23) (SB 017-001-017, 021-001-017, 025-002-013, SB 031-001-016, 037-001, SB 037-020, SB 047-020,102-032,SB 110-033, SB 117-033, SB 120-035, SB 121-038, SB 129-039 )

7.  Equal access to an advanced diploma track programming, with supports and services in Honors level and foreign language programming that focuses on the rigor and skills required of it, has been denied to the Student.

8.  LEA failed to provide the student a Standards Based IEP as directed by federal and state regulations.(Attachment K).  Also see link below:

    a.  https://www.federalregister.gov/documents/2019/07/02/2019-12286/title-i-improving-the-academic-achievement-of-the-disadvantaged-and-general-provisions-technical

9.  LEA denied the Student equal access to Honors level and Foreign Language course content when it unilaterally refused to consider and inform the Parents of the available supports and services in the LRE as well as provide LRE supports and services options in such classes to the Student..

10. The LEA altered IEP documents after an IEP meeting was held and a "FAPE offer" was claimed to have been made by the LEA on June 11, 2018. The LEA provided this altered IEP as a "FAPE offer" and as evidence against the Parent's claims filed in the Virginia Department of Education complaint. (SB 086-004, P 24-11-53) Goals were modified, a new goal was added, and data and grade level was changed as evidenced in the documents.  In the June 11, 2018 IEP goals, the LEA included results of a QRI

assessment that was completed in August, 2018. This IEP document was altered without the knowledge or consent of the Parents.

11. The LEA concealed data relevant to the Present Level of Performance and determination of need, placement and services, which denied a FAPE.

12. The LEA did not provide enough information on the Least Restrictive Environment, which impeded the Parent's ability to provide informed consent and a FAPE.

13. The LEA conducted a reevaluation on November 20, 2019 without the Parents. The LEA were aware the Parents requested the evaluation be delayed until all necessary and required medical evaluations were finalized. The LEA refused and held the reevaluation without the Parents anyway.

14. The Managerial Procedural Support Liaison enacted and led a voting system at the meetings with the school based IEP team in developing Student's IEP and determination of compensatory services on 9/13/19. ( P 18, Audio 9/13/2020)

15. The LEA denied and delayed the  attendance of related service providers (SB 086-001, 004, 006, SB 086-004) until after proposals and refusals of actions were determined by the LEA.

16. The Parents were denied the opportunity to provide informed consent because Prior Written Notices were not created and provided to the Parents for the consent to evaluate April 22, 2015, eligibility June 10, 2015 and IEP's (June 10, 2015, October 16, 2015, May 13,2016).  A PWN was sent out on 11/29/2018 for the 2/23/18, 4/5/18, 5/9/18, 6/8/18, and 6/11/18 IEPs. (SB 089-001)

17. The LEA failed to consider and provide for the effective communication needs of the Student. The Student has private diagnoses of receptive/expressive language disorder and Dyslexia, a language based disability.

18. As a transitioning secondary student, the Student's assistive technology related needs and services weren't considered in the postsecondary transition plan and transition to high school plan (SB 129-005 to 008). The Parents were informed by the managerial Procedural Support Liaison it's not in the purview of the IEP team to determine those AT tools, aids and services in consideration of the future. (Audio 9/13/19)

19. The Student's transition plan to ninth grade and to tenth grade was completed by the LEA without someone with knowledge and expertise in transition. Neither the guidance counselor or career/transition representative has ever been consulted with or attended an IEP meeting to discuss Student's transition.(SB 129-005 to 008)

20. Pre-placement and progress monitoring evaluations were not conducted with fidelity for placement within selected reading programs by the LEA.

    a. LEA has failed to propose an IEP with programming and service hours that can be met with fidelity. The school operates on an alternating block schedule and that was not considered in the proposal of reading programs and services.

    b. The LEA has a "Student Learning Plan" that begins in the seventh grade and is part of the general education programming and setting as well as the H.O.P.S (Homework, organization, and planning skills (HOPS) interventions : a treatment manual by Joshua M. Langberg). Both of these programs and general education settings are available in the LEA but the Student was not provided access to them. The LEA did not provide this plan to the Student prior to proposing a restrictive setting.

21. Both the IEP and PWN (SB 086-034, SB 089-004 to 006) neglect to explain the refusal to provide required evaluations prior to placement into a self-contained remedial class.

22. Extended School Year Services were proposed on June 11, 2018. This was too late in the school year, depriving the Plaintiffs of their due process rights. ESY services were NOT discussed at IEP meetings held on April 5, 2018, May 9, 2018, or June 8, 2018. (SB 089-004, 005, 006, SB 086-033 to 037)

23. The proposed Extended School Year services would take place in a restrictive setting without non-disabled peers for 100% of the service time. The LEA did not allow consideration of another setting, depriving the Student access to the Least Restrictive Environment. The LEA did not provide an explanation as to why the Student could only receive instruction in that setting and placement. The LEA did not respond to the Parent's inquiry as to how the Student's needs would be met by their selected program. The LEA had reported the Student as "advanced" in reading at the time.

24. The LEA did not incorporate into the IEP a data-driven, equitable remedy for their proposed after school instruction. (P20) They did not offer appropriate goals and services

for that proposed instruction to the IEP team so that it could be documented within the IEP, depriving the Student of realistically measurable data points.

25. All areas of need, which include mathematics, were not considered in the development of the Student's IEPs. Parents' concerns with these areas of need were not noted and considered.

**VI. 20 U.S.C 1414 Evaluations and Assessments (§ 22 .1-214 of the Code of Virginia; 34 CFR 300 .304 and 34 CFR 300 .310)(34 CFR 300 .306(a)(2)) 8VAC20-81-60 B 1 g,  (34 CFR 300 .304(c)(5)), ADA, 504, ESSA, Sec.1983, Equal Protection Clause**

1. The July 11,2017 LEA psychological evaluation was not interpreted and scored correctly. The evaluator incorrectly used all 10 subtests to derive the FSIQ, instead of the seven subtests the publisher mandates.  Based on those results, the evaluator replaced the FSIQ with a General Ability Index. Furthermore,the evaluator did not interpret and consider the Student's performance in the nonverbal composite/index where he demonstrated needs.. To date the LEA has not corrected their error. Intelligent Testing-WISC V states, "The FSIQ is the most reliable of the composite scores. It is derived from the sum of 7 subtest scaled scores." (P 10)

   a. "The psychoeducational is at the core of the IEP and eligibility. If up to date evaluation tools are not utilized, the child loses benefit and an equal opportunity of having a FAPE provided as compared to peers that were provided valid and reliable evaluations." (National Association of School Psychologists).

2. The LEA did not provide a results-oriented, realistic, and appropriate post-secondary transition plan" based on comprehensive assessments.

3. In June 2015 and July 2017, with a basis of knowledge, the LEA failed to comprehensively assess the Student. The LEA did not evaluate and consider including curriculum-based measurements, like reading fluency rate and decoding. The LEA failed to observe the Student reading grade level content during instruction as well as assess the Student on those skills within the class setting. The LEA failed to interview and provide input of the physical education teacher, the music teacher, and art teacher. As a result, a

comprehensive evaluation including academic, functional and behavioral data was not conducted and denied the Student a FAPE. (SB 016-003)

4. An initial IEP meeting was held June 10,2015. The IEP team included the Parent, Principal, General Education Teacher, and Special Education Lead Teacher. An LEA psychologist did not attend this initial IEP meeting to provide interpretation and input into the Present Level of Performance and the Student's disability-based unique needs. The Parent was not provided notice of the psychologist's non-attendance. A grade level special education teacher was not present to provide input on grade level curriculum-based measures and instructional settings as well as placement in the development of a proposed IEP to meet the Student's unique needs by providing a foundational basis for educational opportunity.  (SB 017-001)

5. The LEA did not invite all related service providers and an assistive technology service provider for the initial eligibility and IEP meetings on June 10, 2015,  as well as the reevaluation on April 5, 2018.(SB 017-001, SB 061-002) As a result, all the Student's disability-based unique needs were not addressed nor were any suspected needs addressed to determine whether the Student required them in order to be provided FAPE.

6. Parents requests to review the Student's written response booklets and record forms from the evaluations conducted by the LEA were delayed and denied, prohibiting the Parent from making informed consent and fully participating in the IEP and eligibility process. (SB Audio August 20, 2020, August 22, 2020, September 13, 2020)

7. All of the following evaluations were inaccurately scored and reported by the LEA:

    a. The Parents were not granted access to the Student's  KTEA-3 (July 2017) written response booklets and record forms until February 2020. The Parent was given only an hour to review these booklets and forms. In that time, the Parent identified multiple and significant scoring errors. The LEA's special education department chair was aware of these errors but did not previously make the Parent aware of them. The LEA denied the Parents a copy of the Student's KTEA-3 written response booklets.  The Parent asked to please have the KTEA-3 educational testing rescored for the IEP meeting on 3/10/2020. The LEA failed to rescore it nor did they have those written response booklets available at that IEP meeting as requested by the Parent. To date the LEA has not provided the rescoring or updated evaluation report. Since the Parent is a former educational evaluator for the LEA and owns the scoring manual for the KTEA-3, she was able to score multiple portions of that assessment from the notes taken down from the Student's

booklet. The Student was not average in the area of writing as reported by the LEA. The Student was significantly below average in writing.

b. On August 20, 2019, the LEA Speech and Language evaluation was found to be scored incorrectly. Although the scores are documented in the average range there are patterns of strengths and weaknesses that were not accurately presented and documented in previous documentation. The Speech and Language Assessment tool, CELF 5, is not recommended by the Virginia Department of Education(VDOE Marie Ireland) referenced the following review from the Leaders Project *'Despite the CELF-5's attempt to design a comprehensive, valid and reliable language assessment, results obtained cannot be used to determine the presence of a language disorder. The CELF-5 was determined to lack validity due to an unrepresentative standardization sample and an insufficient reference standard.* " (TD2 pg 623-624)

c. In August 2019, the Occupational Therapist reported inaccuracies in her scoring that led to almost a 50 percent decrease on one subtest alone. The LEA did not provide the correct reporting or amend the education record with the updated scores and evaluators signature. The LEA presented the inaccurately scored evaluation data at the Due Process hearing.

d. On 9/13/2019, the school psychologist confirmed the Student didn't respond impulsively and with multiple erasures on a WISC-V subtest as the LEA evaluator had indicated in the report. The Parent requested the evaluation to be rescored but to date, this has not been provided.

e. The LEA denied the Plaintiffs the opportunity to pursue a private evaluator's opinions of the Student's assessments when the LEA denied the Parents a copy of the Student's response booklets.

f. The Student has not been provided a transition assessment.

8. Both the IEP and PWN (SB 089-004 to 006) neglect to explain the refusal to provide the necessary evaluations prior to placing the student into a self-contained class implementing one of the structured reading programs listed on the "Fairfax County Public Schools Description of Specialized Reading Program: High Incidence". This document states, "Each specialized reading program dictates its fidelity and implementation guidelines." The LEA admits in their "Hot Topics" reporting they have

not been able to provide the provide program fidelity and implementation to Dyslexia students.

9.  The Parents consented to an "expedited" Assistive Technology evaluation on June 19, 2017 to take place prior to the student transitioning to middle school. Fairfax County Public Schools failed to provide this evaluation until October 2017, after the Student had already started seventh grade and after the IEP meeting that took place prior to the start of school on August 23, 2017.  (Audio 6/19/17 6/27/17 SB 047-001-023).

    a.  The assistive technology evaluation was not based on a research driven assessment.
    b.  The FCPS IEP documents and procedural safeguards documents do not clearly inform the parents of the continuum of assistive technology tools and its availability as a related service.
    c.  IEP documents up to 2020 (SB 017-001-017, 021-001-017, 025-002-013, SB 031-001-016, 037-001, SB 037-020, SB 047-020,102-032,SB 110-033, SB 117-033, SB 120-035, SB 121-038, SB 129-039 ) include an incomplete listing of additional/related services.  Parents are not informed or provided the opportunity to select and consider all related services whether indirect or direct for their child.

10. The LEA did not interpret the scores of the Student's RAN/RAS performance correctly and as a result, services and educational opportunities were denied. The Student demonstrated disability-based needs in the 2014-2015 evaluations but was not provided any appropriate services and interventions to meet his unique disability based needs. The researchers of the rapid Automatic Naming state, "Because of the close correspondence between naming and reading processes, very low performances on the RAN/RAS Tests in the early grades should be red flags to teachers and clinicians. Furthermore, children who have very low performance on RAN/RAS Tests and very low performance on phoneme awareness test are frequently the most impaired readers (Wolf & Bowers, 1999). Thus, low standard scores on RAN/RAS Tests should alert the educator that further testing is needed and that extra attention should be considered when developing reading fluency skills for that child."

11. The LEA failed to appropriately identify the unique needs of the Student in their ESY proposal.  The LEA stated that ESY was proposed "to support the student's current reading needs." (SB 086-053) The PWN written on 11/29/18 states ESY was proposed to, "strengthen Student's reading skills." (SB 089-005, SB 086-053)  The LEA violated their own standards regarding ESY (Attachment S) and failed to provide FAPE to the Student. The LEA's own reasoning (SB 089-005, SB 086-53) for ESY fails to meet any of the

factors listed in Attachment S, which would indicate the need for ESY. The LEA failed to determine what benefits the Student gained during the school year that would be *significantly jeopardized* if the Student did not receive services during an extended break. Also, the LEA informed the Plaintiffs during this time that the Student was grade level in Reading.

12. LEA failed to consider the Parents proposals for a service placement in the least restrictive environment including a home-based, ESY delivery of services. (Audio 6/11/18, SB 086-053, SB 089-005)

13. The LEA failed to consider and propose ESY services at any other time after the Parent would not consent to their first ESY proposal made on June 11, 2018. (SB 123-005) ESY services were not offered throughout the Student's eighth grade school year. (SB 102-001, 002, 003)

14. The June 11, 2018 ESY proposed self-contained instructional placement of services that was not the Student's base school. No justification for the change in school assignment and placement was provided to the Parents. (Audio 6/11/18)

15. Based on the LEA reported reading inventory the Student would have tested out of the placement levels for the proposed program in the self-contained ESY setting.

16. In the June 11, 2018 IEP, the FCPS team proposed ESY services with the Student to begin a new reading program and goals for ESY. (SB 086-053). The Extended School Year coordinator of the LEA stated it wasn't common practice to start new goals and a new literacy curriculum during Extended School Year between grade levels. (P 20)

17. ESY was proposed without all team members on June 11, 2018. The Student and Plaintiffs were denied the right to due process and the ability to make an informed consent. (SB 086-033, SB 086-053).

18. FCPS claimed that the June 11, 2018 IEP was a "full FAPE offer", yet the cover page to the June 11, 2018 IEP (SB 086-004) does not indicate the ESY proposal was validated and finalized. The IEP incorrectly identifies the base school and most recent eligibility date as well as the Student's grade.

19. At the October 17, 2018 IEP meeting, the recording reflects the LEA's refusal to engage in discussion with the Parents, inform the Parents, or even consider the Student's unique needs in providing comparable benefit and services as to those the Student's nondisabled

peers have access to. (Audio 10/17/18: 55:00)  During discussion regarding the differences between co-taught and honors classes, the LEA only considered general education track/level standards and not honors track/level standards. (Audio 10/17/18:59:00).  The LEA IEP team did not consider IB or honors track/level standards (Audio 10/17/18:1:00:00)  The LEA IEP team would not not discuss whether the Student requires appropriate supports, services and accommodations in an honors class, but rather only discussed special education supports in the general education classroom.  (Audio 10/17/18: 1:06:00)  The general education teacher (science) present at the IEP meeting stated she could not recommend honors track/level classes because even though the
/   Student has cognitive ability, the Student would not receive the supports needed in the honors track/level class because the Student's school does not provide special education services in the honors track/level standards setting.

## VII. Retaliation and Discrimination IDEA, 504, Title II ADA, Sec. 1983 Equal Protection Clause

1. At the Due Process Hearing, the LEA (specifically by the Coordinator of Due Process and Eligibility) weaponized a Parent comment made in a closed/private, online special education support group, infringing upon the Parents' rights. (SB 134-001)

2. Both Senior Staff and Staff in the LEA Due Process and Eligibility office have posted derogatory messages in public forums online regarding parents who lawfully exercise their rights to make FOIA and FERPA requests as well as demeaning the IEP process. These posts show the culture and attitude of the LEA, specifically in the Office of Due Process and Eligibility.

   a. LEA representatives wrote the following public statement: *"I hate the Freedom of Information Act* !!! You don't need to know. People just need to live in ignorant bliss. #have a blessed day"  (Attachment L)

   b. LEA representatives wrote the following public statement: *"Let's be honest....folks who FOIA or FERPA entities for information are basically doing it to be PITAs Trust and believe.... So to that I say KMA. "* (Attachment L)

3. The LEA has both concealed documents and destroyed documents.

   a. The LEA has been previously sanctioned in Federal Court for the destruction of evidence/documents. See:

https://www.usnews.com/news/us/articles/2019-06-28/judge-sanctions-school-system-for-destroying-documents- Judge Nachmanoff - Doe v. FCPS

4. After the Parents began to report their concerns of FAPE denial and discrimination, the LEA restricted access and consideration of advanced classes for the Student during IEP meetings (Audio 8/23/2017).

5. The Due Process and Eligibility Coordinator has restricted the Parent's access to the education record by severely limiting the Parent's time to review the records as well as failure to produce the Student's complete education record.

6. The LEA discriminates based on disability by failing to provide a specialized designed instructional setting and placement for OHI.

7. The LEA and Hearing Officer retaliated and discriminated against the Plaintiff's advocate impeding the Plaintiffs right to a fair and impartial due process hearing.

8. The LEA delayed and denied required team members and professionals upon the Plaintiff's request.

9. At the April 5, 2018 IEP meeting, the Parents requested an FCPS iPad to assist the Student, which all FCPS IEP team members agreed would be a good idea (SB 08-037). FCPS never pursued providing the Student an iPad and one was never provided.

10. Parent requests to have data and parental concerns included on the IEP's Present Level of Performance is constantly denied.

11. After the Parents requested a Least Restrictive Setting of "team taught" special education services in a general education setting for advanced-track "Honors" classes, the LEA began to report the Student was no longer performing adequately in advanced level classes.

12. After the Parents requested indirect dyslexia services in Foreign Language, the LEA began to report the Student was "not exerting effort" in his Foreign Language class. However, prior to the request, the Student was reported as "diligent and exhibiting independent study skills" on the teacher narrative in the same class.

13. The LEA OT evaluation report stated the Student should have core classes in the morning. FCPS team members agreed with this evaluation, yet the LEA placed the Student's seventh and eighth grade core classes in the afternoon.

14. The LEA denied the Parent request to hold an IEP meeting on June 19, 2018. The Associate Principal responded stating, "Mrs. H and our teachers have left for summer vacation and will not be able to respond until August. They will not be able to address any further questions or concerns with you until that time. At this point, <the school> has proposed an IEP that we feel meets all of Student's needs." (P 20 )

15. At the IEP meeting on October 17, 2018, in response to the Parents' request for a team-taught honors level science class, the Program Manager stated, "He (Student) is supported up through the general education level. That's what Fairfax County's obligation is." (Audio 10/17/18)

16. The LEA has instructional programming in the general education setting to meet the Student's needs. They have not provided the instruction or considered the programming. (Attachment H, J, P)

17. The LEA exhibits a pattern of failure to provide dyslexia services with fidelity as evidenced in their own statements. They wrote " *Dyslexia and fidelity of instruction continue to be significant concerns across the division." "These concerns have led to hospitalizations and then more restrictive placements for several students."*(Attachment H)

18. The LEA does not make available equal access and educational opportunities to the Student due to inequitable access and options in class settings and programming from one school to another. It is based on staffing/funding allocation and not the individual needs of the child with a disability.  (Attachment J)

19. The Plaintiffs were denied the opportunity to attend the November 2019 reevaluation meeting which took place under the pending due process timeframe. The Parents confirmed with the LEA that required and necessary data from pending private medical evaluations had not been finalized and requested the LEA to postpone the reevaluation so this data could be reviewed.  The LEA ignored the Parent's request and convened the meeting anyway, without the Parents.

**Jurisdiction and Venue**

This Court has original jurisdiction pursuant to 28 U.S.C. 1331 because this case raises federal questions. Venue is proper pursuant to 28 U.S.C. 1391(b). The U.S. District Court for the Eastern District of Virginia, Alexandria Division, is the proper Division pursuant to Rule 3 of the Local Rules for the Eastern District of Virginia.

## Standard of Review

This is an appeal initiated by the Parents, and as such, the burden of proof and persuasion to establish by a preponderance of the evidence that Fairfax County Public Schools failed to provide the student with FAPE concerning the issued raised rests on the Parents. Schaffer, ex rel. Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528 (2005)

The Parents have overwhelmingly met this burden by introducing credible evidence that Student was not provided and continues to be denied the necessary accommodations, related services, and specialized instruction to address his disabilities, and those that were offered by Fairfax County Public Schools were not reasonably calculated to provide him with meaningful educational benefits to meet his unique needs based on the standards set forth in Endrew v. Douglas Cty. Sch. Dist. RE-1, 2017 WL 1066260 (2017) and Hendrick Hudson Dist. Bd. Of Educ. V. Rowley, 458 U.S. 176, 102 S.Ct. 3034 (1982).

"A FAPE, as the Act defines it, includes both 'special education' and 'related services.' §1401(9). "Special education" is 'specially designed instruction . . . to meet the unique needs of a child with a disability'; 'related services' are the support services 'required to assist a child . . . to benefit from' that instruction."- Endrew F. v. Douglas County Sch. Dist (2017)  In this case, FCPS has failed to not only provide Student with the required special education services that allow him to remain in the least restrictive setting; but they have also repeatedly refused to provide him with the related services; specifically dyslexia support services, that would permit him to remain in the least restrictive environment.

"A focus on the particular child is at the core of the IDEA. The instruction offered must be 'specially designed' to meet a child's 'unique needs' through an "[i]individualized education program." §§1401(29), (14) An IEP is not a form document. It is constructed only after careful

consideration of the child's present levels of achievement, disability, and potential for growth. §§1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)- Endrew F. v. Douglas County Sch. Dist (2017).

The bottom line is that Student has yet to be able to successfully access the general curriculum in the least restrictive environment due to the LEA's refusal to provide desperately needed services to address Student's deficits related to his Dyslexia (SLD) identification by the LEA in 2014, in addition to providing the staff with the required training in Dyslexia to support Student's unique needs. As testified by Student's current case manager, who admitted to being aware that Student was failing Spanish, had not communicated with his parents or the IEP Team regarding this; but unilaterally dismissed the academic failure of Student being lazy and not putting forth the required effort. At no point did the case manager inquire as to whether Student's dyslexia was impacting his access to the general curriculum and ability to achieve academically within the Spanish class, which is a required course for Student to earn an advanced diploma. The case manager also determined that Student can always receive a Standard Diploma if he does not pass Spanish class (TR2 pg581:9, 20-21), which is not consistent with the determinations of the IEP Team, Student's goals, or the Student's own aspirations. The dismissive, non-responsive, and stance of low expectations for Student by his current case manager, is indicative of the overall attitude of Fairfax County Public Schools in its ongoing refusal to collaboratively partner with the Parents and their advocates in an effort to rectify the procedural and substantive non-compliance issues that severely impeded Student's access to FAPE and receipt of supplementary aids and services within the least restrictive educational setting.

Furthermore, as the Parents, one of whom has been designated as an expert in special education by the hearing officer, repeatedly attempted to effectively advocate and meaningfully engage with the school division as equal IEP/Eligibility Team members; they have faced egregious hostility and retaliation; which includes the withholding of relevant records and IEP Team members; preventing the Parents from providing informed consent. The Parents' assertions regarding the denial of fundamental procedural safeguard protections such as the right to access and inspect their Student's complete cumulative record have been severely and repeatedly violated by the LEA; making it impossible for the Parents to provide any form of informed consent. Furthermore, as both Parent and the school LEA witnesses testified; has identified numerous protocol errors in the evaluations completed by the school division staff; specifically as it pertains to the QRI-6 (Reading Assessment) and the Speech/Language Assessments; which were conducted and scored incorrectly, by the school division's own admission through testimony in this proceeding. As opposed to collaborating in a productive manner with the Parents to ensure that the remaining evaluations were compliant with the required protocols, both Parents testified that the school division became more adamant in withholding testing protocols, cumulative file records, and assessment data from the Parents and IEP/Eligibility Team. The Parents also assert that the literacy file and District-wide Assessments of Student was

intentionally "lost" by the school division in order to avoid presenting data, via a file review, that would substantiate the need for direct and/or indirect dyslexia services for Student.

Fairfax County Public Schools further substantiates the Parents' claims of FAPE denial when they propose a more restrictive educational setting for Student to receive direct reading instruction; unilaterally determining, without attempting to deliver the instruction or collecting data; that direct reading instruction for Student cannot be provided within the general educational setting with supplementary aids and supports, although his previous case manager testified that direct reading instruction is provided to students within the general educational setting on a routine basis, and that she provides that instruction.

In an overall act of sophistry to avoid accountability and responsibility for an extensive history of FAPE denial regarding Student, FCPS attempts to mischaracterize highly engaged, qualified, and persistent Parents as "uncooperative" and "unwilling" to meet with the school division staff. The LEA has also engaged in retaliation, as documented in the August 12, 2019 correspondence to Eligibility and Due Process Coordinator, authored by the Parents' attorney. (Attachment Q) The LEA repeatedly classified being held "accountable" under the IDEA by the Parents with being "attacked" by the family, making a collaborative relationship in the best interest of the Student impossible. This mischaracterization of the Parents, specifically the Student's mother, was completely discounted by the LEA's own witness, Student's former case manager for the eighth grade; who disagreed with the characterization of the Parent as "having an axe to grind," and being "uncooperative." (TR2 499:5-10, 499:22, 500: 1-18) This claim also contradicts the LEA's own evidence in which it is documented that, prior to the filing of this proceeding, the Parents have willingly met with the school division over fifteen times in less than a year all for the sole purpose of working in good faith to meet the unique needs of Student. It was not until, after over four years of attempting to collaborate with the LEA unsuccessfully, leading to FCPS becoming increasingly hostile and retaliatory toward the Parents, that they finally decided to exercise their dispute resolution rights as a last resort to secure FAPE for the Student.
As a result of the Parents' exercising their rights under the IDEA and questioning the school division's inaccurate evaluations and proposals not based on valid data or the unique needs of Student ; Fairfax County Public Schools has characterized the Parents and their advocates as "uncooperative" and "having an axe to grind" as stated, under oath by FCPS' Coordinator of Due Process and Eligibility (TR2 423:18-20, 428:12-14). The effective advocacy efforts have also resulted in the Parents, their advocates, and Student's teachers facing retaliation and intimidation by the LEA's administration for not blindly "complying" to all of the demands of the LEA as it relates to Student's educational programming, even when the proposals are potentially emotionally harmful to Student, such as the unilateral decision to place him in a more restrictive setting with peers that are not his equal socially or academically.

FCPS failed to share all relevant evaluative information with the Parents; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent. (34 CFR 300.614. 34 CFR 300.9)

This denial of FAPE is not in dispute.  To date, as testified to by The Parent, who was identified as an expert witness in the field of Special Education,  (Parent's Exhibit 25) , and is a former Special Educator with Fairfax County Public Schools; relevant literacy data, which include DRA, QRI-6, (Parent's Exhibit 7 and 12) and over 200 pages of relevant records was not shared with either the Parents nor the IEP/Eligibility Team that is making decisions regarding Student's educational programming. The Parent has also developed an extensive comparison of the deficiencies regarding Student's IEP's since 2017, which she provided expert testimony regarding; (Parent's Exhibit 23)  Since 2017, the LEA teams that have made educational programming determinations regarding Student have done so without the relevant information, as repeatedly asserted by the Parents, but disregarded by the LEA.   The failure of FCPS to maintain an educational record, in compliance with the provisions of 34 CFR 300.611, FERPA 20 USC 1232g(a)(3), and the Code of Virginia 22.1-289; made it impossible for the IEP and Eligibility Teams to develop an educational plan that met Student's complex needs, specifically in the area of dyslexia.

FCPS failed to communicate rejections and proposals with sufficient clarity and finality; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

This denial of FAPE is not in dispute.  Under 34 CFR §300.503(a), the school LEA must give you a written notice (information received in writing), whenever the school LEA: (1) Proposes to begin or change the identification, evaluation, or educational placement of your child or the provision of a free appropriate public education (FAPE) to your child; or (2) Refuses to begin or change the identification, evaluation, or educational placement of your child or the provision of FAPE to your child.. The school LEA must provide the notice in understandable language (34 CFR §300.503(c)). Numerous witnesses all provided ample testimony to support the Parents' claim that not only did FCPS fail to comply with the provisions of  34 CFR §300.503(a), but that the staff created their own criteria for providing a Prior Written Notice that was not consistent with their own internal protocols, which require that a Prior Written Notice be provided to the Parents within ten days of the proposal/rejection made by the school division.  Both the Program Manager for Support Liaisons and the Procedural Support Liaison (PSL) both testified that their practice was to issue a Prior Written Notice after a "full FAPE" offer had been developed, even if it took months and more than one meeting to secure.   Both witnesses' were discredited by the Parent and Coordinator of Due Process and Eligibility, who confirmed that a Prior Written Notice is required each time that a proposal and/or rejection is made by the LEA.  (SB 087, 089, 123)

FCPS failed to specify and provide justification to the percentage of time and duration of time in placement in comparison to regular education settings. It was only documented on the last IEP proposal that was completed without the Parents.

This denial of FAPE is not in dispute. FCPS was unable to explain and/or justify the designated service times for the Student within the general education, collaborative, and self-contained settings. In fact, Student's previous case manager testified that it would be impossible to deliver the proposed direct instruction in reading, as documented in the August 22, 2019 proposed IEP, under the current block schedule (TR2 513:2-4, 16-18). Neither the Program Manager nor the PSL were able to explain the percentage of services on the services page of either the August or the September 2019 IEP's with any clarity or understanding, which is required for the Parents to provide informed consent. (SB 129-38 and SB 129-39)

FCPS failed to make educational recommendations/decisions based upon the individual needs of the Student; resulting in an educational plan that is inconsistent with the Endrews standard to address the student's unique circumstances; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

FCPS consistently refused to provide the Parents with the full continuum of services available to the Student to address his unique needs, specifically as it pertains to dyslexia. The Student's current case manager, testified that she was not aware that "indirect" dyslexia services were available for Student to support him in his Spanish class. In fact, she testified that she was unaware of the term, "indirect services." Furthermore, the data collection process that FCPS used to determine progress for Student was riddled with errors, incomplete samples, unfinished documents, undated work samples, improperly labeled samples, as well as failing to document which accommodations/modifications were implemented for Student to determine the overall effectiveness of his educational program. The failure of FCPS to collect data with fidelity in order to determine the effectiveness of Student's academic programming directly hindered the efforts to individualize his programming to meet his unique needs. Student's current case manager also testified that she has not collected data, to date, in compliance with his current IEP, regarding his Spanish class, where he was struggling with a "C" during the first nine weeks and is presently failing the class. It is also noted that it was recommended that the Student "needs to seek support outside of class," but this comment from his Algebra Teacher was disregarded by his case manager. (SB 131)

FCPS consistently failed to have required school staff in attendance; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

The Parents spent months and wasted meetings insisting that the required specialists attend Student's IEP Meetings; an audiologist did attend the August 2019, after concerns were raised by the Parent in April 5, 2018. (P13, 14, 15, 16, and 17) The responsibility to have the appropriate individuals in attendance at the IEP Meeting is not under the Parents' auspices but is a mandate to the school LEA by the IDEA.   To date, a Dyslexia Specialist has yet to attend Student's IEP Meetings to ensure that he is receiving the appropriate direct/indirect services that allow him to make academic progress and access the general curriculum in the least restrictive setting.   While the LEA assigned Dr. E J as the specialist that addresses dyslexia on Student's IEP Team, she testified that she was not the "Dyslexia Specialist" for the LEA, and that she was required to conduct consults with the LEA's Dyslexia Specialist regarding Student's needs, but never notified the Parents of this, nor did she share this with the IEP Team.

34 CFR 300.321(a), (c), (d):
"The local educational agency shall ensure that the IEP team for each child with a disability includes:
> d. A representative of the local educational agency who is: 1) Qualified to provide or supervise the provision of specially designed instruction to meet the unique needs of children with disabilities.

Dr. EJ, the Educational Specialist, did not meet this requirement as it pertains to being "qualified to provide or supervise the provision of specially designed instruction" to meet Student's needs, specifically in the area of dyslexia. At no point during the times in which she served on the IEP Team did she offer the option of indirect or direct dyslexia services, despite having knowledge that Student was identified with dyslexia in 2014 by FCPS.  Had FCPS included the LEA's Dyslexia Specialist (as the Parents had requested numerous times), then one can conclude that she would have had the capacity and competence to offer the full continuum of indirect/direct services to the Parents for consideration.

FCPS consistently failed to allow for participation of persons invited by Parents; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

The Parents both testified that they felt as though their participation as equal IEP Team Members for the Student was severely interfered with and even obstructed by the school division staff; specifically, the Program Manager, who would often talk over them, cut them off, and attempt to

avoid documenting their parental concerns as stated. The Program Manager further substantiated the Parents' claims that their participation and meaningful engagement was truncated by the school division when she admitted to developing a "customized IEP Meeting agenda," (Parent's Exhibit 17-1 and 17-41) that was inconsistent with the school division's agenda, and that only permitted the parent less than five minutes of input within a two-hour meeting. Both Parents testified that they had no input in the "customized IEP Meeting agenda," and that when they raised concerns or challenged the pre-determined agenda for limiting their participation, they were deemed to be "disruptive" and "not conducive to the IEP process;" which usually led to the IEP Meeting being abruptly ended; further retaliating against the Parents for exercising their rights under the IDEA to have meaningful engagement. In Doug C. v. Hawaii, the Court ruled otherwise while quoting the 2003 Ninth Circuit Shapiro case - " '[a]fter-the-fact parental involvement is not enough' because the IDEA contemplates parental involvement in the 'creation process' . . . It is uncontested that, at the time of the December 7 meeting, the new IEP was already completed and adopted. Therefore, the after-the-fact meeting is not enough to remedy the Department's decision to hold the initial IEP meeting, in which they created the IEP and changed Spencer's placement, without Doug C." (Page 16)-Doug C. v. Hawaii (9th Cir. 2013) In each of the instances in which FCPS convened an IEP Meeting, the IEP was already "created" and there was little or no ability for the Parents to participate in the "drafting process." Any efforts to do so by the Parents and/or their advocates, as testified by the Parents, was met with resistance and disregard. At no point have the Parents, as equal IEP Team members for Student, participated in the "creation" process of their son's IEP, despite making every attempt to do so. (P 13, 14, 15, 16, and 17) Instead, FCPS had repeatedly demanded that the Parents "rubber stamp" the LEA's substandard IEP "draft" proposal, which the LEA identified as a "full FAPE" offer when it was not, by their own admission.

FCPS consistently made recommendations based upon evaluations that were not completed with fidelity and in accordance with the prescribed protocols; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent. When the Parents requested copies of the written response booklets and record forms, their FERPA and FOIA requests were denied. Their requests to also have them sent to private providers qualified to rescore and interpret the assessment data, were denied as well. The LEA asserts the Parents and providers may not have copies of the Student's written response protocols and record forms, even with redaction of publisher testing material. In *NewPort-Mesa Unified School District v. State of California Department of Education*, the court found that giving a copy of a copyrighted test protocol to the parents of special education students falls within the "fair use doctrine" of federal copyright law (17 U.S.C. 107). Furthermore, " To minimize the risk of improper use, the District may choose to use appropriate safeguards, such as requiring a review by parents of the original test protocols before obtaining a copy, a written request for a copy, a nondisclosure of confidentiality agreement, or other

reasonable measures" (p. 1179) Providing a protocol to another qualified provider may allow parents to obtain a second opinion on their child's educational needs without additional testing.

The Parent testified, in detail, as an expert witness in the field of Special Education, and as a former Special Educator with the LEA, that several of the evaluations completed by the school division were incomplete, not properly considered, not completed with fidelity, and/or scored incorrectly.  (SB 001, 006, 008, 010, 012, 015,  018, 024, 027, 029, 030, 034, 040, 041, 055, 056, 057, 070, 075, 076, 077, 080, 081) The Parent, PSL, and Speech-Language Pathologist all testified that it was The Parent who identified errors in the evaluation protocols conducted by the school division evaluators.  Each also testified that corrections had to be made and revised evaluation reports had to be issued as a result of The Parent's oversight and vigilance to ensure compliance with the fidelity of the evaluation process.  The Parent also testified that it was the Parent who provided a detailed report to the LEA, outlining the myriad of protocol errors that were conducted by the LEA staff that performed the QRI-6 Reading assessment on the Student. The Parent testified that once she began reviewing evaluation protocols and identifying significant errors in the school division staff's assessments; she was severely limited in her participation to inspect and review the protocols by the Principal.  The Parent testified that at one point, the Principal became physically aggressive and assaulted her when she attempted to obtain copies of Student's assessment answer sheet documents to ensure that they were scored correctly due to her experience with several other assessments that were not completed correctly.  The Parent also testified that she continues to have grave concerns regarding the validity and reliability of the evaluations utilized by the Eligibility Team to develop the Student's educational plan.  She also testified that the LEA admitted to failing to comply with Student's IEP accommodations. (SB 081)

FCPS admitted that they "lost" Student's literacy file and its contents (DRA's, DSA's Rewards reading program data and assessments etc.) as well as EDSL and Universal Screener data; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

The Parents testified that for several years, they have asserted that Student's educational record was incomplete and tampered with in an effort to avoid providing the required individualized instruction for him, specifically in the area of dyslexia.  The Assistant Principal testified that he had been advised that over 200 pages of Student's educational record was "discovered" in a closet of Robinson Middle School, where Student attended previously.  The Parents confirmed that the records contained portions of Student's literacy file, which is highly relevant documentation as it pertains to providing the appropriate level and intensity of services to address the academic impact of Student's dyslexia identification that was made by FCPS in 2014.  Incredulously, the Assistant Principal, Principal, Program Manager, and Support

Specialist all testified that they have yet to review and/or inspect the recently located over 200 pages of Student's educational record to determine its impact on Student's present educational programming.   In fact, both, the Assistant Principal and Principal claim that the over 200 pages are not relevant, despite having not reviewed them.   The Principal, who is the designated custodian of Student's educational file, also claims that she does not know if these over 200 pages have been added to Student's educational record since they were "discovered" over two months ago, further substantiating the Parents' assertions of a denial of FAPE when not one of the IEP/Eligibility Team members has conducted a comprehensive file review for Student, yet continue to make educational programming and eligibility decisions based on an incomplete and inaccurate educational file, lacking the relevant information to allow the Parents to provide informed consent for special education and related services.  (P 18)

FCPS consistently failed to include measurable goals and evidence-based data collection methodologies in the proposed IEP; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

Both the former and present case managers for Student testified that they were unable to identify which accommodations were utilized by Student based on the work sample exhibits provided. (SB 080) In fact, the work samples were considered to be invalid due to the fact that they could not provide data that related to and/or supported Student's IEP goals.  Once again, the Parents challenged the "junk data" that was provided that was undated, incomplete, never shared with the IEP/Eligibility Team, not sent home as data for Student's nine week progress reports as required by his IEP; and never placed in Student's educational record as required by his current IEP. When the Parents raised concerns about the scarcity of work samples, the incompleteness of the work samples, and the inability to utilize the work samples to measure progress as it relates to IEP goals and accommodations use; they were disregarded by the LEA.

The LEA consistently failed to appropriately address the need for Extended School Year Services (ESY); refusing to utilize the objective checklist tool required by the LEA; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent.

The Parent testified the LEA failed to appropriately address the need for Extended School Year Services for Student, by limiting consideration for ESY to the summer months only to provide support for Student's reading deficits, in violation of 34 CFR 300.106 (b).  In addition, the evidence documents that the requirement that the Student begin a direct instruction reading program in the summer was an unnecessary delay in vital special education services that could have and should have been provided for the Student from 2014 to the present.  The failure of

FCPS to properly and objectively assess whether the Student required ESY, not just isolated to the summer months, constitutes a denial of a FAPE and directly impacted his academic progress; resulting in the division proposing a more restrictive instructional setting, (self-contained), for reading support.

FCPS consistently refused to objectively and thoroughly "consider" Independent Educational Evaluative information brought in by the parents from highly credentialed evaluators; prohibiting the parents from serving as active participants in the decision-making process as well as interfering with the parents' ability to provide informed consent. As recently as days prior to the Due Process proceeding, the LEA has failed to fully consider IEE's provided by the Parents. As both Parents testified to, upon receiving an IEE from the family, FCPS failed to invite the appropriate LEA evaluator that would be able to interpret the IEE and provide insight as to how to develop individualized programming for Student based on the IEE; specifically in the areas of Audiology and Speech-Language, where FCPS attempted to have unqualified IEP Team members interpret the IEE's; resulting in the team having to reschedule the meeting to allow for qualified individuals to be present. To date, the LEA has yet to include the county's Dyslexia Specialist as a member of the IEP Team (or attend any IEP meetings either in person or over the phone) in order to properly interpret data, explain the impact of dyslexia on Student in the academic setting, and recommend programming and related services for Student.
FCPS' own experts could not arrive at a consensus as to what constitutes a "full FAPE offer," indicating that August 22, 2019 IEP Proposal was a "full FAPE offer," via the Prior Written Notice; however, the Program Manager testified that it was NOT a "full FAPE offer," while the PSL testified that it was a "full FAPE offer. Despite this, the PSL, Program Manager, Principal, and Assistant Principal, all expected the Parents to provide "uninformed consent" for the IEP's proposed.

The testimonies of the Coordinator of Due Process and Eligibility, Program Manager, Support Liaison, the Educational Specialist, Principal, and Assistant Principal are all in conflict as it pertains to what constitutes a "full FAPE offer." It would stand to reason that if the school division staff is unclear as to what constitutes a "full FAPE offer," then how can the Parents be expected to comprehend the concept, then provide "informed consent," to an offer that cannot be agreed upon by the school-based members of Student's IEP Team. Both the Coordinator of Due Process and Eligibility and Program Manager testified that the concept of a "full FAPE offer" is not identified in the IDEA but is a "FCPS" abstract concept for computer administrative purposes. The Program Manager, who assisted the PSL in drafting the August 22, 2019 Prior Written Notice (PWN) in which the term "full FAPE offer" was noted, also claimed that to date, a "full FAPE offer" has NOT been developed for the Student. Despite the admission by the Program Manager that the February 23, 2018, August 22, 2019, and September 13, 2019 IEP's

do not provide FAPE for the Student, the LEA continues to insist that the Parents provide consent to these IEPs. (SB 029-001, SB 121-001, FCSB PS 129-001, P 22)

## ARGUMENTS AND CONCLUSION OF LAW

The LEA had the diagnosis of specific learning disability with impairments in reading and writing ("Dyslexia") since 2014 and their reports recognized it but the IEP's didn't reflect the necessary changes to meet those needs. In 2017 FCPS didn't consider it in their evaluations either. December 2017 IEE came in and we met in February where the IEE wasn't fully considered and no changes in the IEP were proposed to meet his needs/ Eligibility for SLD took place in April 2018 and no service changes were proposed until the start of the next school year. "Under the SLD definition in the Virginia regulations, dyslexia is defined as a SLD that is "...neurobiological in origin. It is characterized by difficulties with accurate and/fluent word recognition and by poor spelling and decoding abilities." It is the most prevalent of the disorder under the subtypes of SLD." 8 VAC §20-81-10. While the reauthorized IDEA does not mandate that a LEA use a particular methodology. But if the chosen methodology does not work, then there may be a denial of FAPE if the student fails to progress. See Miller v. Board of Education of the Albuquerque Public Schools, 455 F.2d 1286, 1307-1309, aff'd. on other grounds, Miller v. Board of Education of the Albuquerque Public Schools, 565 F.3d 1232 (10th Cir. 2009), in which the student's parents were entitled to reimbursement for costs of funding their own program when the student stopped receiving appropriate instruction from the LEA and then ceased progressing.

The Court has the authority to grant relief as deemed appropriate based on their findings. Equity practices are considered in fashioning a remedy, with broad discretion permitted. Florence County School LEA Four v. Carter ex rel Carter, 510 U.S. 7, 17 (1993). The Court should grant compensatory education if appropriate with an inquiry that is "qualitative, fact-intensive and above all, tailored to the unique needs of the disabled student." Branham v. LEA of Columbia, 427 F.3d 7, 9 (D.C. Cir. 2005). Where a court finds a deprivation of FAPE it should return the student to the educational path that would have been traveled had the educational agency provided that child with an appropriate education in the first place. G.L. v. Ligonier Valley School LEA Authority, 802 F.3d 601, 620 (3d. Cir. 2015)." In this case, it is glaring clear that since 2014, when the Student was initially identified by the LEA as having a specific learning Disability ("Dyslexia), he was entitled to a minimum of "indirect services," which should have been offered within the continuum of services during each of his IEP Meetings since 2014, but was not.

As a result of this denial of FAPE, the parents were forced to secure a FAPE through their own financial means, via a tutor and private evaluations, which they are entitled to reimbursement for.  "Parents may be entitled to reimbursement for the cost of placement or services they obtained when the school LEA failed to provide FAPE, the private unilateral placement or services were appropriate under IDEA and not provided by the school system, and no statutory or equitable reasons bar reimbursement. 20 U.S.C. §1412(a)(10)(C); Burlington School Committee v. Massachusetts Department of Education, 471 U.S. 359, 369-371 (1885).  The Court may award "educational services…to be provided prospectively to compensate for a past deficient program." Reid ex rel Reid v. LEA of Columbia, 402 F.3d 516, 522 (D.C. Cir. 2005). Compensatory education under §1415(i)(2)(C)(iii) is usually prospective, but that is not always the case. Department of Education v. Zachary B. ex rel. Jennifer B, Civ No 08-00499 JMS/LEK, 2009 WL 3985686 (D. Hawaii 2009); G. ex rel Sgt. RG v. Fort Bragg Dependent Schools, 324 F.3d 240, 253 (4th Cir. 2003). "  In this instance, compensatory services to recover services that should have been provided since 2014, that consist of direct reading instruction within the general education setting as well as indirect/direct dyslexia support services are appropriate for the Student.  It can be assumed that had the parents known about the indirect/direct dyslexia services offered by the LEA, they would have consented to the services for the Student.  The efforts of the school division to conceal these indirect services since 2014 robbed the Student of significant educational benefit and warrants the Court awarding the Student compensatory indirect services from 2014 to the present.

The Procedural Safeguards of IDEA and 504 (a) enable parental participation in matters concerning their child's educational program (b) allow parents to have an administrative judicial review of the LEA's decisions upon their child's education. IDEIA amends the IDEA in that it does contain express statute of limitations for compensatory education but IDEIA is not retroactive. Also, it did not amend Section 504.When IDEIA is applied the parents request for compensatory education occurs when (a)"parent was prevented from requesting a hearing due to specific misrepresentation by the local education agency ("LEA") that it had resolved the problem forming the basis of the complaint or (b) the local education agency's ("LEA") withholding of information from the parent that was required under this part to be provided to the parent" U.S.C 1415 (f) (3) (D), ADA Title II, 504 ESSA , sec.1983 Equal Protection Clause

 Based on the testimony of each school board witness, opining that Student requires a self-contained setting in order to receive direct reading instruction; it can be concluded that the school division, itself, is conceding that their instructional methods, that have not provided the appropriate supplementary aids and services, within the general educational setting for the past six years have been ineffective and unable to provide Student with educational benefit, which constitutes an admitted denial of FAPE.  The school division's rush to place the Student in a self-contained class is not to meet Student's "unique" needs, but to allow for the convenience of

the school division staff based on their block scheduling, while avoiding the added expense of providing supplementary supports and services within the general educational setting.
34 CFR 300.42 defines supplementary aids and services as "…aids, services, and other supports that are provided in regular education classes,…to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate…" To date, as confirmed in the testimonies of The Parents and the Case Managers; no such effort to provide supplementary aids and services has been provided for Student as it relates to direct reading instruction in the general education classroom, in violation of Least Restrictive Environment; 300.114 LRE requirements, which state:

    (a) General.
        (1) Except as provided in §300.324(d)(2) (regarding children with disabilities in adult prisons), the State must have in effect policies and procedures to ensure that public agencies in the State meet the LRE requirements of this section and §§300.115 through 300.120.
        (2) Each public agency must ensure that—
            (i) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and
            (ii) Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The Parents are not in agreement with this more restrictive placement rightfully so since the placement does not consider Student's "unique" needs in the least restrictive setting as mandated by Endrews, and no effort to implement supplementary aids and services for direct reading instruction have been attempted by FCPS. FCPS' unilateral placement recommendation is also inconsistent with the OSEP "Dear Colleague;" guidance document, dated October 23, 2015, regarding supporting students with dyslexia in the general education setting; which states: "For those students who may need additional academic and behavior supports to succeed in the general educational environment, school may choose to implement MTSS, multi-tiered system of supports…MTSS is a school wide approach that addresses the needs of all students, including struggling learners and students with disabilities…to maximize student achievement." Both the LEA's expert witnesses and his parents testified that Student was never afforded the provisions of MTSS aides, services, and supports prior to the unilateral self-contained placement proposal, which is highly restrictive socially and educationally.

When a school LEA denies a student a FAPE, the student is entitled to relief that is "appropriate" in light of the purposes of the IDEA.  School Comm. of the Town of Burlington v. Dept. of Educ., 471 U.S. 359, 369, 105 S.Ct. 1996 (1985); see also 20 U.S.C. §1415(i).  Thus, parents are entitled to retroactive reimbursement for services they have procured for their child when the school LEA failed to provide appropriate educational services based on the student's unique needs; to include "related services" as mandated by the IDEA. Burlington, 471 U.S. at 370.  In this instance, Fairfax County Public Schools continue to make the grave error of attempting to fit Student into their generic programming within the default self-contained setting as opposed to crafting authentically specialized and individualized instructional plan that meets the Student's unique needs.

## CONCLUSION

For the foregoing reasons, the Student and Parents prayerfully request that the Court to rule in their favor regarding all issues and arguments related to this proceeding, in addition to granting all relief that the Court deems appropriate, to include the following relief:

1. Fairfax County Public Schools will provide the Parents with any and all documents related to, referencing, and/or naming the Student that are in the school division's possession. These documents will be provided via electronic means.   (To include all assessment response booklets and record forms).

2. Fairfax County Public Schools will provide compensatory educational services for the reading intervention, writing intervention, indirect dyslexia services, assistive technology, appropriate ESY, Speech and Language and Occupational Therapy, math, and executive functioning strategies that the Student should have received from the Student's Kindergarten through ninth grade school years as well as all future services required to ensure a FAPE.

3. Fairfax County Public Schools will allow Student access to needed special education supports and services in all programs and courses to include those tracked as "advanced" level as well as to provide a specific plan within the Student's IEP to ensure access, supports and services.

4. Fairfax County Public Schools will collaborate with the parents to develop a Memorandum of Understanding regarding the Parents' role as IEP Team members, which includes the provision for a complete and comprehensive student educational record file review as a component of the Eligibility Process.

5. Fairfax County Public School will convene a restorative justice circle, under the supervision of a mediator from The Virginia Center For Restorative Justice,  with Student's IEP Team members in order to address the harm that has been committed as well as begin rebuilding a trusting relationship required for effective collaboration on behalf of Student.   The mediator will be present at all special education meetings going forward to ensure that all participants are heard and respected.

6. Fairfax County Public Schools will reimburse the parents for all fees, costs, and expenses associated with providing a FAPE for the Student; to include advocacy fees as a related service as well as such other relief the Court deems warranted.

7. Fairfax County Public Schools will inform parents of all assistive technology services available as a "related service" based on Student's unique needs.

8. Fairfax County Public Schools will provide open enrollment to schools and academic programs for students with disabilities in order to allow equal access to the varying continuum of placements and course offerings in each school, and this issue will be a required agenda item for Student's IEP meetings.

9. Fairfax County Public Schools will provide cultural sensitivity training to the IEP team members regarding the impact of invoking law enforcement on individuals of color; as well as understanding the impact of the abuse of white privilege and white fragility within the confines of a diverse IEP Team.

10. Fairfax County Public Schools will provide training to teachers on how to plan for and implement indirect dyslexia services; to include: executive functioning strategies and literacy interventions within the general educational setting in order to meet Student's unique needs within the least restrictive setting.

11. Respectfully request the Court's consideration of sanctions for Fairfax County Public Schools counsel pursuing and obtaining HIPPA protected medical records without an endorsed subpoena (Quashed).

12. Respectfully request the Court's consideration of sanctions for Fairfax County Public Schools counsel misrepresenting the education record to the Hearing Officer as well as the family. Counsel billed FCPS to review 4,000+ pages of the Student's record but only represented 500 pages as the complete record.

13. Respectfully request the Court's consideration of sanctions for Fairfax County Public Schools counsel for withholding the transcripts for the Due Process Hearing from the Parents and advocate until after closing arguments were due.

In Doug C. v. Hawaii (9th Cir. 2013) The Court identified two primary purposes of IDEA. The first is to prepare the child for "further education, employment and independent living." [See 20 USC § 1400(d)(1)(A). The second purpose of the law is "to ensure that the rights of children with disabilities and parents of such children are protected." [See 20 USC § 1400(d)(1)(B). It is glaring clear that in this instant case, FCPS has not only failed to prepare Student for "further education, employment, and independent living," by denying vital specialized services, but that the LEA has also violated the rights of his Parents as they have sought to advocate for his right to FAPE. We request that the Court restore the protections of access and advocacy back to the Student and Parents.

Respectfully Submitted,

Michael Tisler and Debra Tisler on Behalf of S.T, pro se

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of this appeal.

Michael Tisler and Debra Tisler, pro se

Executed on: April 13, 2020

Michael Tisler and Debra Tisler
5765F Burke Centre Parkway
#120
Burke, Virginia 22015